Statement of the Case.
MONROE, C. J.
This ease has been brought up for the review of a judgment rendered by the Court of Appeal, First circuit, maintaining a seizure, by attachment, of some 2,500 concrete piles which had been manufactured by J. J. Paquette and O. R. Mongeau, and by them delivered on the lake shore front of the town of Mandeville, where all save about 50 of them were accepted by the town council (the 50 thus mentioned having been accepted at another place and subsequently delivered on the lake front); which council had thereupon made a payment to Paquette & Mongeau, and their subrogee, of $10,000, with the understanding and intention that the piles so delivered and accepted Mongeau) had contracted with the town to were to be used in the construction of a sea wall on said front, which they (Paquette & construct, and which, at the time of the seizure, they had partly constructed.
The attachment was issued at the instance of plaintiff herein, a commercial firm composed of Mrs. N. Levy and H. H. Levy, who sued J. J. Paquette and the town of Mandeville, for $356.28, as a balance alleged to be due for goods, wares, and merchandise sold to Paquette, and by him used in the construction of the wall and the carrying on of the contract above mentioned; it being alleged that the town became liable in solido with Paquette by reason of its' failure to record the contract and to execute a bond, “as required by law,” and that plaintiff is entitled, as a "furnisher of supplies,” to a lien and privilege on the wall; also that the town has released Mongeau, and that Paquette has become “the sole principal under said contract”; upon which allegations (as to the lien and privilege) plaintiff caused a writ of sequestration to issue, and the piles, together with certain implements, used in the execution of the contract were seized under both writs. The sequestration was thereafter dissolved, in a proceeding by rule, and plaintiff, acquiescing, has abandoned its claim to any lien or privilege, save such as may have resulted from the seizure by attachment, as also its claim for a judgment in money against the town. The affidavit for the attachment was made on December 3, 1915, and sets forth, among other things, that Paquette had left the state permanently, and resides in Mississippi, and that he is concealing himself to avoid being cited and forced to answer to the suit intended to be brought against him. The seizure Was made on December 4, 1915. The sole question here presented for decision is whether the piles in question were subject to seizure, at the suit of Paquette’s ordinary creditor, to the prejudice of the right therein which is asserted by the town.
It appears from the evidence that the contract between Paquette and Mongeau (hereafter called contractors) and the town of Mandeville (hereafter called town) was entered into on May 1, 1914, and that the contractors thereby agreed as follows:
“To provide all the material and perform all the work for the building and completion of a 7,000-foot sea wall along the beach front of the town,” according to certain specifications and under the direction of a superintend* ent to be named by the town.
“Art. 5. Should the contractors, at any time, refuse or neglect to supply a sufficiency of *247 properly skilled workmen, or of materials of the proper quality, or fail ip any respect to prosecute the work with promptness and diligence, or fail in the performance of any of the agreements herein contained, the town shall be at liberty, after three days’ written notice to the contractors, to provide such labor and material, and to deduct the cost [from the amount] then due, or to become due thereafter, to the contractors * * «; and if the superintendent shall certify that such refusal, neglect, or failure is sufficient ground for such action, the town shall be [authorized] to terminate the employment of the contractors for the work, and enter upon the premises and take possession, for the purpose of completing' the work included in this contract, of all material, tools, and appliances thereon, and to employ any other person to finish the work, and. to provide the materials therefor; and, in case of such discontinuance of the employment of the contractors, they shall not be entitled to receive any further payment under this contract until the said work shall be wholly finished, at which time, if the unpaid balance of the amount to be paid under this contract shall exceed the expense incurred by the town in finishing the work, such excess shall be paid by the town to the contractors, but, if such expense shall exceed such unpaid balance, the contractors shall pay the difference to the town. The expense incurred by the town, as herein provided for, cither for furnishing materials or for finishing the work, and any damage incurred through such default, shall bo audited and certified by the superintendent, whose certificate thereof shall he conclusive upon the parties.
“Art. 6. The contractors shall complete the several portions of the work comprehended in this agreement by and at the times hereinafter stated, to wit, the whole work under this contract shall be completed on or by January 1, 1915 ” (subsequently extended to January 1, 1916).
Article 8 fixes the price to be paid by the town at $28,000, “less $1.60 per lineal foot, for which the contractors are to look to the property holders, but which amount is to he paid by the town for all streets crossed; all payments by the town to be made in current funds, upon the certificates of the superintendent, as follows: Ton thousand ($10,000.00) dollars to be paid when the piles are made; $1,000.00 at the completion of each block of 550 feet, more or less, less the $1.60 per lineal foot frontage, which the contractors are to collect from the property holder or holders and town, as hereinabove specified. The final payment shall be made within ten days after the completion of. the work included in this contract ; provided, that the contractors shall furnish proper certificates that all claims for material and labor or damage arising out of the contract, for which, the contractors are sought to be made liable, have been paid, or their claims satisfied; otherwise final payment to be held up, or a sufficient portion thereof as may be necessary to satisfy such outstanding claims.
“Art. 9. It is further agreed * * * that no certificates given in payment under this contract, except the final certificate or final payment, shall be conclusive evidence of the performance of this contract, either wholly or in part, and that no payment shall be construed to (be) an acceptance of defective work or improper materials.
“Art. 10. The contractors shall, during the progress of the work, maintain cyclone or storm insurance on said work, the policies to cover all the work incorporated and all materials for the same on or about the ground, and shall be made payable to the parties hereto as their interests may appear,’’ etc.
On October 24, 1914, the contractors, by a written instrument, to which the mayor of the town and Peter Jung were parties, agreed that, in consideration of advances made and to be made by Jung for the making of the piles and the payment and liquidation of pressing bills and obligations contracted in connection therewith, Jung should be, and was, subrogated to their rights with respect to the $10,-000 which, according to the contract, were to be paid upon the making of the piles. The act of subrogation differs from tbe original contract in that it declares that the town, through its mayor, duly authorized, recognizes Jung as the true and lawful subrogee of J. J. Paquette and Oscar R. Mongeau, and “entitled to the payment of said $10,000, to-be paid when piles are made, after said piles are approved by the superintendent and accepted by the town council of Mandeville.” And on January 2, 1915, the town council passed a resolution, the preamble and body of which read in part:
“Whereas, the town council * * * have this day examined all of the piles made in *249 conformity with the contract; * * * and whereas, the town council, as superintendent, in the examination of said piles, have found that the same have been properly made and are duly accepted by said town council:
“Be it resolved that the town council, as superintendent and as town council, do accept the said piles as constructed, and the first payment of $10,000 conditioned upon the completion of said piles and their acceptance by the town council, be now paid to said contractors, Messrs. J. J. Paquette and O. R. Mongeau, or Mr. Peter Jung, subrogee, as their interests may appear; the said town council, as superintendent, legally constituted, having accepted the same, and said payment of $10,000 be-mg now due and owing.”
Upon the same day, by notarial act, Paquette, Mongeau, and Jung executed a receipt containing the recitals that the two former had entered into the contract with the town; “that one of the conditions of payment in said contract is that the sum of $10,000 shall be paid to said contractors when all the piles shall be made, completed, and accepted by the town of Mandeville” ; that Jung had been subrogated to the right of the contractors to receive said sum; that the piles had been completed and accepted, and that the contractors acknowledged the receipt of the $10,000, and directed that it be paid to Jung; to which is added the declaration by Jung that the money had been so paid, and that he granted full acquittance .therefor.
It is stated by Mr. H. H.-Levy (a member of the plaintiff firm), in the course of his testimony, that Mongeau “dropped out,” either before the completion of the piles or soon thereafter, and that is all that is to be found in the record to support plaintiff’s allegation that Mongeau was “released” by the town, though that allegation is specifically denied in the answer of the town.
On September 29, 1915, there was a severe storm which greatly damaged the unfinished work that was in progress, and damaged and scattered the various appliances with which it was being carried on, and thereupon Paquette, to whom Mongeau appears to have left the matter, abandoned the contract and left the state permanently. At the moment, however, no one seems to have known his intentions - or where he went. He simply disappeared, leaving his own troubles, and his creditors, with their troubles, behind him. It is said that his son represented him for a while, but all that the testimony shows upon that subject is that his son remained in Mandeville for about a month, and was seen going about as though interested in his father’s assets that were scattered along the beach. It is not shown that he communicated with the town authorities in regard to the abandoned contract; that he professed to act under authority from or knew anything more concerning the whereabouts of his father than any one else, or that he did any particular thing which would indicate that he was acting otherwise than from mere filial interest. As we understand the testimony, the “wall” to which the contract here in question relates was to be constructed of the concrete piles thereby called for, which were to be driven or otherwise placed in juxtaposition to each other, so as to form a row 7,000 feet in length. The piles are shown to have been each two feet wide, so that the whole number required was 3,500, of which about 1,000 had been put in position when the storm came, and, say, 2,500 were lying upon the shore ready to be put in position. As a matter of fact, Mongeau appears to have “dropped out,” after the payment of the $10,-000 to Jung, though there is nothing positive to sho-w that he was released by the town. On October 27, 1915, the mayor of the town, not knowing what had become of Paquette, wrote to the vice president of the company which is said to have been the surety on the bond which the town had taken from the contractors, saying:
“I write to say that at present no work is being done on the sea wall in the town of Mandeville, and, as Mr. Paquette has not been here for some time, could you kindly let me know when Mr. Paquette intends to resume the work. *251 We are having delightful weather at present for the continuance of the work, and, as you are aware, these delays are encroaching on the extended time of its completion. I would be pleased if you would see Mr. Paquette and let me know when he intends to commence working, so that the contract may be completed. Thanking you for an early reply, I am,” etc.
What answer, if any, the mayor received is not shown. The piles, as we have stated, were attached on December 4, 1915, and a curator ad hoc, appointed to represent Paquette, filed ail answer on November 9th, saying that the latter was permanently absent from the state, and that he (the curator) had been unable to communicate with him further than to learn that he would take no interest and put in no appearance in the case. The town also filed an answer, which appears to have been sworn to some time in November, before a, notary, but neither the exact date of the affidavit nor that of the filing in court are disclosed. On January 12, 1916, the town, through the mayor, addressed another letter to the surety company, calling attention to the fact that the company was surety in the sum of $7,500 for Paquette and Mongeau on their contract; that Paquette had defaulted thereon; that the company had been so advised, but had taken no steps; and notifying it that the town would proceed to advertise for bids for the completion of the work, and would hold Paquette and the surety liable for any loss that might result from the default. And thereafter, on July 12, 1916, a contract was entered into with another concern, one of the stipulations of which was that the contractor should use the piles already constructed in so far as they might be found suitable.
Opinion.
[1] This case has been thoroughly argued by counsel, and carefully considered by the Court of Appeal, both upon the original hearing and on rehearing, upon which latter occasion it became necessary to call in two distinguished members of the Baton Rouge bar as judges ad hoc, one of whom, Mr. Benj. H. Taylor, with the concurrence of the organ of the court in the original decision, handed down an opinion affirming and reinstating that decision, and the other of whom, Mr. T. Jones Cross, handed down a dissenting opinion.
In the original opinion of the Court of Appeal it is said, inter alia:
“The vital question presented here for decision is as to whether there was a sale of the piles to the town of Mandeville; and, if there was a sale, was there a transfer of possession from Paquette to the town prior to the seizure of the piles under the writ of attachment. * *' * It is obvious that the town never intended to buy those tools and appliances, which fact makes it quite clear that the authority to take the materials, the piles included, was intended, only to permit the town to continue the work to completion and for no other purpose. We believe it safe to say that, if those piles had been injured or damaged while tying on the beach, and before being used in the construction of the wall, the loss would unquestionably have fallen on Paquette, and not on the town,” etc.
The court found that the piles were attached prior to their acceptance by the town, saying:
“Counsel for the town refer to two acceptances, by notarial deeds, of January 2, 1916. The record shows that the seizure was effected in December, 1915, at a time prior to the notarial acceptances referred to, and prior to the transfer of possession as before stated.”
But there was error in that finding. The record shows that the acceptance of the piles and the payment of the $10,000 took place on January 2, 1915, nearly 11 months before the levy of the attachment. In the opinion on the rehearing it is said:
“We are clear that the payment of the $10,-000 was simply a payment on account and in accordance with the terms of the contract, and that it did not in any way affect the ownership of the piles, which was certainty not in the municipality at any time. * * * It was argued with much earnestness that an attaching creditor secures no greater rights in or to the *253 property attached than the debtor himself had, and, since Paquette could not himself have alienated any of the piles after the $10,000 had been paid to him, it necessarily follows that no creditor of his could acquire any rights against them to the prejudice of the municipality. The answer to this is that it is our opinion that Paquette had a perfect legal right to make any disposition of the piles he might have seen fit, up to the time the defendant took possession of them, under the terms of the contract, on January 2, 1916.”
Mr. Cross, in his able dissenting opinion, holds the pivotal question to be whether the town secured possession of the piles when, on January 2, 1915, it accepted them, and paid the $10,000, and he considers that the ease is within the intendment of C. C. 2761, which view of the matter is based upon the ground that the contract for the building of the sea wall was one of the letting and hiring of labor and industry, and not of sale, and that it was competent for the parties, whether that contract called for the doing of the work en bloc or in parts, to agree that it should be verified, delivered, and accepted in parts, and that, as to the piles here in question, the work was so verified, delivered, accepted, and paid for.
“In the ordinary contracts for constructing houses, or other works,” the opinion proceeds, “when the undertaker uses material previously manufactured, and which he merely buys and fashions for use in the building, the fashioning or fitting of such materials, and their full preparation for incorporation in the work, does not carry with it a presumption of delivery to the owner, even where they are paid for. All these are articles bought by the undertaker, and, unless attached, as a component part, to real estate — a matter that is subject to other principles —their delivery to the owner is governed by the ordinary rules controlling the sale and delivery of movables. But when the material or articles to be incorporated in the work are fabricated by the undertaker, they do not form the subject-matter of a sale, but of a contract of the hii'ing of industry; and when such articles are completed, and, though constituting only a fraction of the work, are specifically accepted and paid; for, then they are presumed to have been delivered to the owner. They are in the possession, under the control, and at the risk of the owner, under the rules prescribed by O. O. 2756-2767. Of such character was the moulding, completion, and delivery of the piles in this case. * * * The contract for the construction of the sea wall contemplated successive deliveries; first, the delivery of the completed piles, made of material belonging to the contractors; then the delivery of 550 foot sections of the sea wall, made of materials belonging to the town.”
The learned judge ad hoe then states that, though thus far his conclusions have been based upon the presumption of delivery growing out of the character of the contract and the provisions of the Code relating to the letting of industry, it is not necessary to rely upon presumption, since, in his opinion, it is shown affirmatively that the piles were actually delivered on January 2, 1915, and he gives his reasons for that opinion, which are founded on the facts as herein before stated. He is also of the opinion that the attachment should be dissolved, because Mongeau, Paquette’s partner, was not made a party defendant, was not shown to have been released by the town of Mandeville or otherwise, and presumably has an interest in the property seized.
As there was no law prohibiting them from so doing, the parties to the contract here in question were at liberty to agree that the town should pay the contractors $10,000 when the piles were made, and thereafter to interpret their contract to mean, or amend it to mean, that the money should be paid when the piles were made and accepted, and pursuant to the contract as thus interpreted or amended the piles were inspected by the town council, approved and accepted, as the proper material to be used in the construction of the wall, and the $10,000, were thereupon paid to the contractors and their creditors and subrogee and receipted for by them. It is said, as we have seen, in the original opinion by our Brother of the Court of Appeal, that it was quite clear that *255 the authority to take the piles “was intended only to permit the town to continue the work to completion, and for no other purpose”; and, on the rehearing by the learned judge ad hoe (without disputing the intention with which the piles were accepted and the payment made), that “it is our opinion that Paquette had a perfect legal right to make any disposition of the piles that he might have seen fit, up to the time defendant took possession of them, under the terms of the contract, on January 2, 1916.” Considering the proposition last stated, it is evident that, if Paquette had the legal right to take away and make other disposition of the piles immediately after he had received the $10,009, in consideration of his making them, to be'used in the erection of the wall, and tlieir acceptance by the town for that use, he would have been enabled to retain the money, and the town would have been in a position to be deprived of the sole consideration for which it had paid it to him; all in violation of a contract the admitted intention of which was that those particular piles should be used in the construction of the wall which Paquette and his associate had contracted to build. It seems reasonably evident, therefore, that Paquette could not legally have made any other disposition of the piles than that which, according to his contract with the town, he had received payment to make. Returning then, to the finding in the original opinion, that it was the intention of the parties to the contract that the piles should be used for the completion of the wall (in which finding we concur), the question naturally suggests itself if, by a contract the legality of which is unquestionable, Paquette agreed to make certain concrete piles, and use, them in the construction of a sea wall for the protection of the town and if, upon the making of the piles and their acceptance by the town for that use, he was to receive $10,000, and if the piles were made and accepted, and the money received as thus agreed, how does it happen that, though Paquette himself could not thereafter have made other disposition of the piles, they are seized at the suit of one of his creditors in satisfaction of an ordinary debt due by him, and that numerous briefs and judicial opinions are required to determine whether or not the seizure should be main•tained? The answer to that is that, though a contract may be legal and binding as between the parties thereto, it does not necessarily bind those who are not parties to it. Thus the law declares that “if movable property has been alienated by contract, but not delivered, it is liable in -the hands of the obligor to seizure and attachment in behalf of bis creditors.” O. C. 1923. And the further answer is that misapprehension sometimes arises as to the character of a contract, and hence as to the law by which it is governed. In the instant case we concur in the view expressed by the dissenting judge ad hoc, that the contract before the court is to be construed with reference to those provisions of the Code which relate to the letting and hiring of labor and industry, and more particularly with reference to article 2761, which reads:
“If the work be composed of detached pieces, or made at the rate of so much a measure, the parts may be delivered separately; and that delivery shall be presumed to have taken place if the proprietor has paid to the undertaker the price due for the parts of the work which have already been completed.”
To which may be added article 1924, found under the title “of 'Conventional Obligations,” and which reads:
“What shall be considered a delivery of possession is determined by the rules of law applicable to the situation and nature of the property.”
What is meant, in article 2761, by “detached pieces”’ and parts susceptible of separate delivery is not altogether clear, since “detached pieces” of work may refer either to the tangible thing resulting from the effort *257 of a workman, or to the effort which produces the thing. The French form of the article, as found, in the Code of 1825, reads:
“Art. 2732. S’il s’agit d’un ouvrage á plusiers pieces, ou a la mesure la livraison peut s’en faire par parties, et elle est censee faite, si le maltre a payé l’ouvrier á. proportion de l’ouvrage fait.”
The corresponding article of the Code Napoleon (Chaeard’s translation) reads somewhat differently, to wit:
“1791. If the work is for several pieces or by measure, it may be examined by the parties; it is supposed to be finished for all the parts paid for if the employer pays the workman in proportion to the work done.”
Article 2761 of our present Code is found under the general title “Of Lease,” the subtitle “Of the Letting Out of Labor or Industry” (as distinguished from the “Letting Out of Things”), and the minor subtitle “Of Constructing Buildings According to Plots, and other Works by the Job, and of Furnishing Materials.”
From all of which we conclude that the word “work,” as used in the article, may be applied to both labor and its products.
[2] Considered from either point of view, while it would be reasonable to hold.that in a work, or in the construction of a work, such as' a cantonment, of many buildings, one building might be regarded as a “detached piece,” within the meaning of the article, and delivered separately, it would be unreasonable to hold because a single house is to be composed of so many bricks or so many planks that each brick, or each plank, could be so regarded and delivered. On the other hand, it might very well happen that a contractor, being himself unable to supply the whole of a particular material required for the work undertaken by him, as, for instance, all the steel framing for an office building, would find it absolutely necessary for him to receive and pay, and hence to deliver and be paid for, such material, at a stated time, or stated times, in the course of the work.
In this case the “work,” whether that term be applied to the constructed wall, or to the labor required for its construction, or to both, may be said to have been composed of two elements, or “parts,” to wit, the concrete piles, required for its construction, and the labor required to put the piles in place and thereby construct it. As it happened, the contractors were unable to carry the financial burden of the contract, and were obliged to borrow the money wherewith to pay the expense of buying the material and making the piles and other expenses from Peter Jung, and it is not unlikely that he loaned it upon the condition that he should be reimbursed from the payment required to be made by the town upon the completion of the piles and their acceptance by it. The contract calls for the piles set in the sand along the shore in the form of a wall, and calls for a payment of $10,000 when they are made and accepted, but it does not require the contractors to make them, and we think they would have complied with their contract by furnishing piles made by some one else.
From the point of view of the labor involved, the making of the piles was a detached piece of work from the setting of them up as a sea wall. From the other point of view, they constituted a detached piece of the thing called for by the contract, and which was to be composed of the piles and of the labor of setting them up as a wall. Look at it as you may, therefore, they constituted a part of the “work” which, according to the statute and to the terms of their contract, the contractors were entitled to deliver, and the town to accept and pay for, separately, and, having been so accepted and paid for, there was created by the statute a presumption of delivery, which, if rebuttal were permitted, has not been rebutted; for, considering the “situation and nature of the property,” the use for which it was intended, and the steps taken, *259 we can think of nothing more than was done that could have been required to effect its delivery. It consisted of heavy concrete blocks, which were not easily moved; they were intended to be used in the construction of a sea wall; they were lying upon the “beach front of the town,” where the wall was to be, and had been partly constructed; and the beach front was within the corporate limits, and the control, for the purposes of administration, including that of construcing the wall, of the town, by which they were accepted and paid for under a contract calling for the construction of the wall and for such acceptance and payment. It is true that the ownership, in all of its elements, was not, at once, transferred to the town, since the contractors still had the right to use the piles for the completion of their contract. But, as was said in. Oliver v. Lake, 3 La. Ann. 83: “There is no inconsistency in the concurrent existence of a qualified ownership in one party, and a control and dominion over it [the property] for certain purposes in another party.” And it is evidently within the meaning of article 2761 that, when part of a work has been completed, delivered, accepted, and paid for, all the elements of ownership therein aré considered transferred to -the “proprietor,” save only the right of the contractor to control such part to the extent necessary for the completion of the work. It is also true that the town did not, immediately upon the disappearance of Paquette, take any particular steps with reference to the piles, for the reason that it did not immediately understand that he had abandoned the contract; but the rights of his ordinary creditors were in no wise affected thereby, since he no longer had any right in them that was subject to their seizure. Ft. Pitt Nat. Bank v. Williams, 43 La. Ann. 418, 9 South. 117. The questions whether it was necessary for the town to put Paquette in default, and whether, or when, that was done, are therefore immaterial to the case. Counsel are not asking for any ruling upon the question of the effect, quoad the attachment, of plaintiff’s omission to make Mongeau a party to the suit; and we see no necessity for expressing any opinion upon that subject, since, for the reasons stated, we conclude that the attachment should be dissolved.
Ib is therefore ordered that, in so far as it sustains the writ of attachment, the judgment of the Court of Appeal here made the subject of review be set aside and reversed, and that the judgment of the district court (thereby affirmed) be also in that respect set aside and reversed; and it is now ordered and adjudged that said writ and the seizure thereunder be dissolved and set aside, and tha t plaintiff’s claim against the town of Mandeville be rejected and its suit dismissed. It is further ordered that plaintiff pay all cpsts incurred by the town of Mandeville in this litigation, including the cost of this proceeding.
SOMMER VILLE and O’NIELL, JL, concur in the decree.
LECHE, J., recused, takes no part.
See concurring opinion of PROVO STL, J., 80 South. 275.