REGAN, Judge.
Plaintiff, the S. & W. Investment Co., Inc., instituted this suit against the defendant, Otis W. Sharp & Son, Inc., endeavoring to recover the sum of $2,174.95, representing the cost to repair and complete a damaged swimming pool located in the patio of plaintiff’s motel. Plaintiff explained therein that the shell of the pool floated and cracked following a heavy rainfall as a result of the defendant’s negligence in installing a defective hydrostatic relief valve that failed to permit underground water to enter the empty shell, which in turn caused the external water pressure to push the shell out of the ground.
The defendant answered and asserted that the shell was properly constructed, accepted and paid for by the plaintiff and it was ultimately damaged because plaintiff, as the owner of the partially completed work, omitted to fill the pool with water in conformity with its instructions. Defendant asserted that the pool was to be constructed in two stages. Initially, the shell was to be completed, and after plaintiff had erected the surrounding motel buildings, the contract then required the defendant to complete the pool.
From a judgment awarding plaintiff $2,-174.95, the defendant has prosecuted this appeal.
On September 12, 1961, the defendant contracted to build a swimming pool in the patio of the plaintiff’s motel, which was then under construction, for $4,725.00. The agreement provided in part:
“ARTICLE 1 — SCOPE OF WORK — The Contractor shall furnish all of the material and perform all of the work for the construction of a swimming pool * * *.
* * *
“ARTICLE 3 — PROGRESS PAYMENTS [1] * * * Upon completion *173 of shell (which is all but filter, deck equipment, tile brick, plumb line to building, and interior finish) amt. due $3,000. Remainder due upon completion of pool.”
It was noted in the contract that the owner was obligated to excavate the pool site, remove the excavated material and place backfill around the completed shell.
The reason for the two-stage construction of the pool was to permit heavy equipment access to the site thereof before buildings were erected around the pool. In addition thereto, the plaintiff did not wish to risk damaging the decorative tiling and other pool appurtenances when the buildings were in the process of being erected; therefore, the parties agreed that the finishing touches would be added when the buildings were Completed.
On October 12, 1961, the shell was completed; therefore, the defendant’s workmen and equipment were removed from the job. During the next five days, the plaintiff’s workmen installed the backfill between the top of the shell and the excavation remaining around its sides. While the backfilling was in progress, Robert Choppin, one of defendant’s workmen, returned to the job site in order to ascertain that the bulldozer being used would not damage the water line which extended from the pool to the building. On this occasion he closed the hydrostatic relief valve, connected a garden hose and began filling the pool with water. He estimated that the pool would require two or three days to fill if the water was permitted to run continuously. He stated that he left, returned later and found that the water had been turned off and the hose disconnected. He again connected the hose and resumed filling the shell. Before he left the job, he said he informed the plaintiff’s agents to fill the pool before disconnecting the hose.
On October 20, 1961, defendant sent an invoice for $3,000.00 to Dave Wolzinger, plaintiff’s chairman of the board, which was paid a short time thereafter.
On November 13, 1961, following a heavy rainfall, a large quantity of water found its way under the shell of the pool, causing it to float and crack. The underground water exerted excessive pressure on the empty shell, ultimately uprooting the shallow end of the pool, which caused the shell to appear similar to a large tilted bathtub.
The testimony is conflicting as to whether the defendant’s agents instructed plaintiff’s chairman of the board, Dave Wol-zinger, and its construction superintendent, to fill the shell in order to prevent the floating thereof. Roger Sharp, the defendant’s secretary-treasurer, and Choppin both testified that Wolzinger and Justin Spiehler, construction superintendent, had been informed to fill the shell with water to prevent the possible floating thereof. Both Wol-zinger and Spiehler deny they were so advised ; however, Spiehler admitted he knew it was necessary to keep the shell filled with water, but he failed to explain why this was not done.
It is also disputed whether the pool would have floated had the shell remained empty with the valve open. George Legardeur, Jr., an expert in the field of civil engineering, related that the pool was a floating type with a hydrostatic valve installed in the base. Had the valve been open, he explained, the ground water along the exterior walls possibly would have entered the pool through the valve, thus equalizing the interior and exterior pressure. However, he did concede that the best method for insuring against floating of the pool was to fill the shell thereof with water.
A. C. Cross, president of A. C. Cross Pool Service, Inc., which is a company engaged in repair and maintenance service, testified that he had encountered instances where pools had floated despite the fact that the hydrostatic relief valve was permitted to remain open. In those instances, he explained, the underground water did *174 not flow into the interior rapidly enough to relieve the greater external pressure. He concluded that the defendant’s method of filling the pool was the safest way of preventing it from floating. Defendant’s agent, Roger Sharp, testified substantially to the same effect.
Therefore, while the experts disagree on the effectiveness of an open hydrostatic valve, they all did agree that the most foolproof method to avoid floating was to fill the shell with water.
In any event, the defendant was called to salvage the shell on the day it floated. His efforts were unsuccessful and plaintiff finally employed the services of Family Pools to repair the shell and complete the pool at a cost of $3,899.95. When the shell was damaged plaintiff was still obligated for an additional $1,725.00, if the defendant had completed the pool without incident. Therefore, the plaintiff deducted this amount from the total contract price with Family Pools.
The whole tenor of the record leads us to the inevitable conclusion that the plaintiff’s agent was fully aware of the fact that the pool should have been filled with water, whether he knew it of his own knowledge or was so informed by the defendants; therefore, the ultimate question posed for our consideration is who must bear the loss of this partially completed work.
Plaintiff’s counsel argues primarily that the parties had contracted for the construction of a swimming pool. He insists that the payment of $3,000.00 upon completion of the shell of the pool did not relieve the contractor of the responsibility of preserving the work until the entire pool was completed, and the risk of loss, therefore, must be borne by the contractor until the pool was finally completed and accepted by the owner.
Defendant, on the other hand, argues that the risk of loss is on the plaintiff, who became the owner when it accepted delivery of the completed shell and paid the defendant the sum of $3,000.00 therefor.
Counsel relies upon that section of the Civil Code entitled “Of Constructing Buildings According To Plots, And Other Works By The Job, And Of Furnishing Materials” [2], particularly LSA-C.C. Arts. 2758 and 2761, which provide:
“Art. 2758. When the undertaker furnishes the materials for the work, if the work be destroyed, in whatever manner it may happen, previous to its being delivered to the owner, the loss shall be sustained by the undertaker, unless the proprietor be in default for not receiving it, though duly notified to do so.”
“Art. 2761. If the work be composed of detached pieces, or made at the rate of so much a measure, the parts may be delivered separately, and that delivery shall be presumed to have taken place, if the proprietor has paid to the undertaker the price due for the parts of the work which have already been completed.”
Defendant asserts that the contract was for the construction of a work “composed of detached pieces”; thus, when the shell of the pool was completed and paid for, the owner accepted that part of the partially completed work, which is in conformity with the rationale of LSA-C.C. Art. 2761.
Plaintiff insists that Article 2761 is inapplicable to a contract which is indivisible by nature. An indivisible obligation is defined by LSA-C.C. Art. 2109 as follows:
“The obligation is indivisible, though the thing or the fact which is the object of it, be by its nature divisible, if the light, in which it is considered in *175 the obligation, does not admit of its being partially executed.”
While we agree that an obligation to construct a swimming pool is an indivisible obligation and that the language contained in Article 2761, “ * * * the work be composed of detached pieces * * * ” seems to indicate an intention to include only divisible obligations, this interpretation thereof is not supported by the jurisprudence. Our courts have considered the foregoing article in two cases where the object of both contracts created an indivisible obligation, namely, construction of a building in one instance and a seawall in the other.
In the case entitled Industrial Homestead Ass’n v. Charles A. Junker et al.,[3] an owner sued a contractor for the return of progress payments made upon a building that was destroyed by a storm before it was completed. In deciding that the risk of loss of the partially completed building must be borne by the owner, and not the contractor, the court reasoned thusly:
“The other ground of action of the plaintiff is that the building was blown down before Junker completed and delivered it, and that destruction of it was his loss.
“The law upon the subject is contained in the following articles of the Civil Code.
“ ‘Art. 2758
“ ‘When the undertaker furnishes the materials for the work, if the work be destroyed, in whatever manner it may happen, previous to its being delivered to the owner, the loss shall be sustained by the undertaker, unless the proprietor be in default for not receiving it, though duly notified to do so.’ C.N. 1788
“We interpret this article as applying exclusively to building contracts per aversionam in bulk, which provide for payment after the completion and delivery of the entire work to the owner. But when the building contract provides for the acceptance, delivery and payment of the work in installments as the work progresses, as in this case, the law is different and is governed by the following article:
“ ‘Art. 2761 — If the work is composed of detached pieces, or made at the rate of so much a measure, the parts may be delivered separately; and that delivery shall be presumed to have taken place if the proprietor has paid to the undertaker the price due for the parts of the work which have already been completed.’ C.N. 1791
“In this case two parts had been completed and delivered arid paid for, for it is the payment of those two parts which the plaintiff seeks to recover.
“The reason of the difference of the two articles is obvious, whether we consider the building contract as one of lease or of sale. When the contractor completes a part of a building, it is his work, his property, because he has paid for it in labor and materials; if it be destroyed it is his loss in accordance with Art. C.C. 2758, and the principle ‘res perit domino’; but when he delivers that part to the owner, and receives payment for it from the owner, the ownership of it is transferred from the contractor to the owner who is seized of the ownership, because he has paid for it; it is in the nature of a sale. 30 Dalloz Rep.Leg. p. 556 88; if it perishes while it belongs to the contractor, the loss is his; if it be destroyed after the ownership has passed to the owner, the loss is the latter’s.”
In reaching this conclusion, the organ of the court emphasized that the result *176 was in accord with the French commentators [4] and common law authorities.[5]
The Supreme Court, about two and one half months before the rendition of the foregoing decision, also had occasion to interpret Article 2761 in a case entitled N. Levy & Son v. Paquette.[6] In that case a contractor had agreed to furnish all the labor and material to construct a seawall for the Town of Mandeville. The agreement required the Town to make progress payments as the contractor’s work proceeded, the first payment was to fall due when the contractor completed fabrication of 3,500 pilings. The township made this payment, but before the contractor had driven all of the pilings, a storm greatly damaged the project. It was then abandoned by the contractor. Thereafter, one of the contractor’s creditors seized the pilings which had not yet been driven. In dissolving the attachment, the court reasoned that the Town of Mandeville was the owner of these pilings since they had accepted delivery of the material when the progress payment was made in conformity with the contract. In its opinion, the court stated in part:
“ * * * And it is evidently within the meaning of article 2761 that, when part of a work has been completed, delivered, accepted, and paid for, all the elements of ownership therein are considered transferred to the ‘proprietor/ save only the right of the contractor to control such part to the extent necessary for the completion of the work. * * * ”
In a well reasoned concurring opinion, which impresses us, Justice Provosty expressed the thought that Article 2761 had no application to the contract in question because the construction of a seawall for one lump sum was not a work composed of detached pieces. He stated that:
“ * * * The making and accepting of the piles was to be merely a stage of the work when a partial payment on the contract price should be due; just as in the construction of a house partial payments may become due at various stages in the progress of the work. * * * Articles 2758 and 2761, read together, mean that, when the work is contracted for as a whole, the making of partial -payments does not have the effect of implying an acceptance, but that the materials which have gone into the work, and the labor which has been bestowed upon it, continue to belong to the undertaker, and that, if they perish, the loss is his, according to the principle res perit domino; but that the payment of the price agreed upon for a detached piece, or part, that is to be delivered separately, is not to be considered as a partial payment on the work as a whole, but as a final payment of the contract price, such final payment implying acceptance, just as a final payment of the contract price for the whole work would imply final acceptance. The underlying principle of said articles is that res perit domino, and that the ownership of the materials does not pass from the undertaker to the owner or contractee until delivery and acceptance have taken place.
Unfortunately the foregoing was the concurring, as opposed to the majority, opinion of the Court.
The Supreme Court’s decision in the seawall case was rendered on December 2, 1918. Five months later, that same court refused to grant a writ of certiorari in the *177 Orleans appellate court case previously discussed ; thus, it approved the application of Article 2761 to an agreement providing for the construction of a house. It is significant to emphasize that in each of the foregoing cases, the question which is posed for our consideration herein, that is, who was the owner of the partially completed work, was squarely before the Supreme Court.
Therefore, in accordance with the rationale of the foregoing cases, which we, in conformity with the civil law technique, have used as a guide herein, we must conclude that the agreement to construct a swimming pool involved a work of detached pieces, and the shell became the property of the owner once he paid $3,000.00 to the contractor therefor.
We feel compelled to point out that the rationale of Justice Provosty’s concurring opinion in the Levy case appears to us as a more sound judicial interpretation of Articles 2758 and 2761, than does the majority opinion which, to reiterate, holds that any progress payment on a partially completed building transfers ownership of the incomplete work from the contractor to the owner, unless, of course, the building contract contains a provision to the contrary.
We are critical of the foregoing result since progress payments are made for the benefit of the contractor to enable him to finance and complete his job. If a contractor agrees to erect a house, a seawall or a swimming pool, he has not fulfilled his obligation until he has delivered the object of the contract as a unit. Thus, to supply a presumption of delivery and acceptance of a partially completed work, in a contract to perform an indivisible obligation, is to create a contractual provision obviously not intended by the parties.
In any event our appellate position with respect to the Supreme Court is like that of the participants in a certain renowned military exploit, who though “stormed at with shot and shell” yet “boldly they rode and well”, because, having heard the voice of authority, it was “Theirs not to make reply, theirs not to reason why.”
Having concluded that the plaintiff became the owner of the shell when he paid the defendant contractor, he must then bear the loss occasioned by the heavy rainfall. The-owner or his agent, Spiehler, or both, knew it was necessary to fill the shell with water to prevent the possibility of its floating. The contractor left the jobsite approximately one month before the damage occurred, and the owner was responsible for preserving his property.
For the reasons assigned, the judgment appealed from is reversed and it is now ordered that the plaintiff’s suit be dismissed. Plaintiff is to pay all costs of this litigation.
Reversed.

. The contract is a printed form. That printed portion under Article 3 reads as follows: “PROGRESS PAYMENTS— The Owner shall make payments on account of the contract as follows: 30% upon signing contract, 30% upon installation of reinforcing steel, 30% upon completion of concrete shell, balance when Pool placed in operation.”
The parties completely altered this printed provision by the handwritten clause referring to a progress payment that is quoted in the body of this opinion.

. LSA-C.C. Art. 2750 et seq.

. Orl. App., No. 7402 Unreported, (February 13, 1919). Writs refused May 9, 1919.

. 10 Dalloz Rep.Leg.Supp. p. 261 74, 75, 76; 4 Duvergier p. 396 344; 3 Pothier Louage 436; 2 Guillonard p. 351 784; 2 Trop Louage 990; 1 Domat p. 218 8.

. 2 Parsons on Contracts 517; 9 C.J. 807, § 145; 17A C.J.S. Contracts § 466(2); Siegel v. Eaton & Prince Co., 165 Ill. 550, 46 N.E. 449; Elliott on Contracts, Vol. 3, 1909.

.144 La. 244, 80 So. 269 (December 2, 1918).