LOTTINGER, Judge.
Plaintiff sues the defendant, Huff Truck Lines, Inc., and its workmen’s compensation insurance carrier, Employers’ Casualty Company, for compensation under the Employer’s Liability Act claiming weekly compensation at the rate of $26 per week for a period not exceeding 400 weeks during the period of his disability. He alleges that the defendant, Huff Truck Lines, Inc., is engaged in a hazardous business as defined by the Workmen’s Compensation Law of Louisiana, LSA-R.S. 23:1021 et seq., and that on February 2, 1953, and June 25, 1953, while in defendant's employ and while unloading freight from one of defendant’s trucks he felt a catch in his back. He further alleges that each of the accidents was immediately reported to the defendant; that his injury was diagnosed or described as lumbosacral sprain; that the injury suffered in the two accidents has totally and permanently disabled him to do and perform his work as that of a warehouseman or freight handler. He further alleges that the defendant has failed and refused to pay him the compensation due to him and that its refusal is capricious and arbitrary and without probable cause and he also seeks to recover the statutory penalty of 12% and attorney’s fees of $1,000.
The defendant admitted the employment and admitted that on February 2, 1953, while plaintiff was in its employ that he claimed to have suffered a back strain and that based upon plaintiff’s representations he was furnished competent and adequate medical treatment at the expense of defendant, Employers’ Casualty Company, and was paid workmen’s compensation benefits at the proper compensable rate and that plaintiff returned to work on February 23, 1953, and worked fairly regularly for defendant, Huff Truck Lines, Inc., through June 25, 1953, and on June 26, 1953, plaintiff failed to report for work and on the evening of that date called at the office of defendant and demanded his pay check at which time plaintiff was advised that the manager of defendant, Huff Truck Lines, Inc. had carried his check to her home; plaintiff gave no reason for hot having returned to work on June 26, 1953 and made no complaint of having hurt himself at all on June 25, 1953 and at that time while in the office appeared to have been drinking intoxicating liquor. About a week prior to June 26, 1953, Mary Belle Huff, manager of defendant, had advised its employees, including plaintiff, that if anyone stayed away from work without a good reason that the employee would be laid off, and plaintiff knew of that and knew that he had remained away from work on Friday June 26, 1953 but he gave no adequate reason for having remained away from work and when he telephoned Mary Belle Huff at her home the evening of June 26, 1953 about his pay check, she told *127 him that she was laying him off, and there would he no need for him to report to work. He made no mention whatever to her or to anyone in authority at Huff Truck Lines, Inc. that he had hurt his back or had sustained any injury at all on June 25, 1953. The following day, Saturday, June 27, 1953, he came to the office and got his pay check and did not say anything whatever about having hurt his back on June 25, 1953. He did ask Mary Belle Huff if he could come back to'work and she told him that he could not and he still made no mention to her of any alleged back injury. ,
Further answering, respondents specifically denied that plaintiff sustained any accidental injury at all on June 25, 1953 and respondents specifically denied that plaintiff hurt his back at any time while working for Huff Truck Lines, Inc., after he returned to work for them on or about February 23, 1953.
The defendant admitted that the plaintiff reported the accident of February 2, 1953, but denied that plaintiff reported any accident occurring on or about June 25, 1953. It admitted the compensation rate sued for to be $26 per week .but denied that it was due the plaintiff any compensation. It admitted that its co-defendant, Employers’ Casualty Company, carried its workmen’s compensation liability insurance at the time of the alleged accident and injuries and denied categorically the other allegations of fact contained in plaintiff’s petition.
On the issues as reflected by the pleadings, the case was tried in the lower court and judgment was rendered in favor of defendant and against the plaintiff, rejecting his demands and dismissing his suit. Plaintiff has appealed from the judgment and contends here that he established the occurrence of an accident and his total disability by the preponderance of the evidence adduced on the trial of the case.
We have carefully studied the record in this case and there is not any doubt in our mind that plaintiff suffered an accident on February 2, 1953, as alleged, which produced disability and that he was paid compensation. The defendant by paying compensation and furnishing medical treatment between February 2, 1953 and February 23, 1953, or until plaintiff resumed his work, is not controverted. The only purpose the plaintiff could have urged this previous back strain into the one that he claimed to have suffered on June 25, 1953 would be for the purpose of showing that he had suffered a previous injury to his back which would more likely recur again, and which in fact he alleges occurred again on June 25, 1953, when he was doing practically the same type of work, unloading merchandise from a truck. Therefore, it would serve no useful purpose to analyze the testimony of plaintiff and his witnesses showing the occurrence of the first accident and we will confine our analysis of the evidence to the accident happening on June 25, 1953.
It is plaintiff’s testimony that on the morning of June 25, 1953, he and Willie Jones, the truck driver, were directed to carry two pieces of crated machinery to the Istrouma Laundry in the City of Baton Rouge. Plaintiff claims that before he started out on the trip that morning that he complained to the warehouse dock foreman, Louis Griffin, that he should not send him on a trip like that to unload heavy machinery because of his injured back and that the dock foreman knew of his back condition.
Plaintiff testified that while he and one of the Istrouma employees were up in the truck forcing the machine on the skids and the other was bearing down on the skids was when he injured his back and he stated he had a quick catch right in the same spot (meaning the place where he had had the previous catch on February 2, 1953). He was then asked by his counsel:
“Q. Did you continue to work? A. No, sir, there wasn’t any more work. We had one more stop. I forget the name of the place, but it is up the road, some kind of place where they makes tanks. We had some bands on skids that weigh around somewhere *128 between four or five hundred pounds, well, when we got up there the employees was supposed to unload their own with a winch and well I got checked out up there.”
Plaintiff stated that he told the truck driver that he had injured his back and that when he returned to the terminal he reported the injury to Louis Griffin, the foreman. That the foreman did not tell him anything or to go see a doctor; that it was at the end of the day’s work and he went home and went to bed because he felt so bad and that his back was hurting and he had no where else to go. This accident happened about noon Thursday and plaintiff did not report for work Friday morning. He sent his father to defendant’s office to get his check Friday morning but his father was told he could not get the check without a written order and he returned home and plaintiff went to defendant’s office late in the afternoon on that date and requested his check. His check was not delivered to him because Miss Huff, manager of defendant, had carried the checks to her home. Plaintiff saw Mr. Neyland, the bookkeeper, and Miss Burkhalter, a stenographer or clerk, and Mr. Neyland told him that Miss Huff had carried the checks to her home and then plaintiff decided that he wanted to talk to Miss Huff over the telephone and see if he could go to her home and get his check. Plaintiff states that he told Mr. Neyland that'he did not come to work that day .because he had hurt his back and he also claims' he told Miss Huff over the telephone that he had hurt his back or had been to see the doctor that day and that was his reason for not reporting to work. Plaintiff admits that Miss Huff told him during the telephone conversation that he was through but he contended that he did not know what she meant. The testimony of Mr. Neyland and Miss Burk-halter is to the effect that plaintiff came to the office and inquired about his check and stated to them that the reason he did , not come to work that day was because he had some bills to pay and they also testified that he was under the influence of intoxicating liquor, and that he did not mention anything about a back injury.
Willie Jones, who was driving the truck and working with plaintiff at the time he claims he suffered the accident, testified that at the time they were unloading the second crate of machinery it got off of the skids and that he heard the plaintiff say that he had hurt his back. He stated that plaintiff got in the truck and did not do any more work that afternoon and that he called in at the., office and checked the plaintiff out. After the machinery had been unloaded at the Istrouma Laundry they then went on up the road to deliver some strips of tin or iron which were to be unloaded by the use of a crane or winch at the consignee’s place of business. Jones said the plaintiff did not assist in doing any work in unloading these strips but just stood around. However, the plaintiff says that he did assist in unloading these strips by hooking the tongs on the bundles of merchandise. Plaintiff and Jones rode back together to the warehouse. Plaintiff testified that they arrived there about four o’clock and Jones testified that they arrived there between two and three. Jones said that they knocked off that afternoon because there was no more work or trucking to be done and that he did not see the plaintiff after he went to put up his tractor and came back to the warehouse. The plaintiff said they did not get there until four o’clock and he reported the happening of the accident to the dock foreman, Griffin, but that he did not report it to the manager, Miss Huff, because he thought she was not there. When plaintiff did not get his check Friday afternoon he returned to defendant’s office the next morning and he then found out that his card had been pulled and he considered that he had been fired. The evidence then shows that after he walked out of the office he stated to James Walker that the defendant was going to have trouble with him if they laid him off on account of his back and it is the testimony of Willie Bankston that a similar statement was made to him the following Monday morning.
*129 The witness, Louis Griffin, dock foreman for the defendant at its warehouse, testified that plaintiff never did make any statement to him about injuring his back on Thursday afternoon when he claims to have reported it to him and the first he knew about it was Saturday morning. He saw the plaintiff Friday evening when he went to the office of defendant to get his check and admitted that plaintiff had asked him to borrow a dollar but at that time he told the plaintiff he hadn’t cashed his check and did not have a dollar to lend him.
Plaintiff went to defendant’s place of business on Monday morning," June 29, about six o’clock a. m. He stated that he went there to see if he couldn’t get an authorization to go see a doctor but when he found that his card had been pulled he finally concluded that he had been fired and he left without having any further contact with Miss Huff, the manager.
Dr. Willard J. Dowell, an orthopedic surgeon of Baton Rouge was the only medical expert who testified in the case. He first saw the patient and examined him on July 2, or about 1 week after the' accident is alleged to have happened. At that time he made the following examination and report of plaintiff’s condition to plaintiff’s attorney:
“Thank you for referring Judison Alexander to me for examination and report. This patient was examined on July 2, 1953. He gave a history of two back injuries while employed by the Huff Truck Lines. The first injury occurred in February 1953. At that time the patient stated he was picking up a bundle of paper and injured his back. He was seen by Dr. Me Vea. He says that Dr. McVea strapped his back and later gave him heat treatments. The patient describes having lost two weeks from work at that time. The second injury occurred on about June 25, 1953. The patient states that he injured his back that time on pushing up on some washing machines. The patient described low back pain following that injury. He states he has had no medical treatment this time as his employer would not send him for treatment.
At the time of my examination he was complaining of low back pain with no radiation up his back or to either leg. He did describe some tiredness in his right leg. , He said that the pain in his back is aggravated by bending of the spine, but not by coughing or sneezing.
On examination it is noted that the patient had a rather small inadequate back support which he had been wearing. There was some tenderness over the lumbosacral joint. There was some tightness of the lumbar muscles with the patient standing. It was rather difficult to evaluate this, as the patient didn’t have as much muscle spasm when he was in a prone position. There was some restriction of lumbar flexion with the patient able to flex his spine and hips so that his fingertips were eight inches from the floor. There was a complete range of lateral motion, rotation, and extension of the spine. There was a complete range of hip motion. The patient complained of some discomfort on straight leg raising at 95 degrees bilaterally. The legs were of equal length on clinical examination. Tendon reflexes of the legs were active and physiological. There was no impairment of skin sensation noted in the legs.
As no X-rays had been made, X-rays of the lumbosacral spine were taken at the office of Dr. David S. Malen and were reported by Dr. Clyde Smith. These X-rays showed no evidence of fracture or dislocation. They did show a slight narrowing of the disk space between L-4 and L-5, and L-5 and S — 1. There were rather large hyper-trophic spurs formed on the anterior surfaces of L-4 and L-5.
It is my opinion that this patient has incurred a recurrent lumbosacral sprain. The fact that he has some narrowing of the disk space between *130 L-4 and L-S and L-5 and S-l, along with the arthritic changes may contribute to his recurrent back injuries. I feel that he is in need of treatment at this time and recommend a lumbo-sacral corset. I estimate that he will be partially disabled for six weeks. I would suggest deferring any evaluation for any permanent disability until maximum improvement has taken place.”
He saw the plaintiff and examined him on four or five subsequent occasions at the request of plaintiff’s attorney, where similar examinations and reports were made to plaintiff’s attorney.
The district judge, with the conflicting factual testimony of the witnesses in the case, was compelled to either accept plaintiff’s evidence and that of the witness Jones that he suffered an accident or accept the testimony of Miss Huff, the manager of defendant, and defendant’s other witnesses that plaintiff suffered no compensable accident because he did not report any accident to the management or claim that he had suffered a back strain growing out of the incident of June 25 until after he had been fired. That plaintiff made no request of defendant at any time for medical assistance or attention following the accident of June 25 and that he knew that he should have reported any accident to defendant’s management. Plaintiff’s action in reporting at six o’clock a. m. on Monday, June 29, his usual working hour, couldn’t be considered as an effort on his part to obtain a medical authorization to go see a physician because the weight of the evidence shows that he did not ask Miss Huff for permission to see a doctor on Saturday and he did not mention anything about permission to see a doctor when he was in the office and talked to the bookkeeper, Mr. Neyland, on Friday afternoon.
Dr. Dowell, in making his diagnosis of plaintiff’s disability accepted plaintiff’s history of two back strains, which, together with the X-ray radiograms showing widening of spaces of the disc of the vertebrae as well as the spurs and arthritic condition, could reach no other conclusion than that the physical findings on his examination were consistent with the history plaintiff had given him. There is no. doubt in our mind that the plaintiff’s arthritic condition with the widening of the spaces between the disc of the vertebrae and the work plaintiff was doing would naturally be conducive to his backache. The doctor frankly admitted the accident and back strain had nothing to do with aggravating or producing the arthritis or the widening of the spaces between the intervertebral discs but that coupled with plaintiff’s posture and the strain he is purported to have suffered all were conducive to produce the disability that he had.
The doctor recommended in practically all of his examinations of the plaintiff that he return to some form of light work and that would be the only way to tell whether or not he could resume his former labor.
With this maze of conflicting testimony before the trial judge, who had an opportunity to see and who perhaps knew the witnesses who testified, and who was in a far better position than we are to evaluate their credibility and the effect of their testimony, denied the plaintiff’s claim. For us to say now that he was wrong and reverse his judgment we would have to point to some error of fact reflected by the record. Plaintiff evidently did not consider the accident and injury seriously until after he knew he was discharged for breaking the rules of the defendant in failing to report to work. It was not until after he was discharged that he considered the accident because he went to see his lawyer before he even went to see a doctor about his back and his only approach to the doctor was through his lawyer.
When we take into consideration the number of claims currently being made for compensation before the courts on account of back strains, and from the great number of cases we have read and examined, it is our opinion that courts ought to go to scrutinizing the testimony *131 in these cases more carefully because of the nature of the disability claimed. It is easy to allege and to prove a back'strain because the examining physician has to give so much consideration to the history of the strain supplied by the plaintiff, especially when considered with a congenital deformity or a diseased condition of the vertebrae. If the examining physician knew all of the facts and the various things the claimant actually did or said at the time, or immediately following one of these lumbosacral strains, he would be. in a position to properly evaluate a claimant’s disability at the time of his examination. If Dr. Dowell had known at the time he first examined the plaintiff in this case, that the claimant made no further complaint to the witness Jones other than to say he hurt his back but showed no outward emotion by evidence of pain immediately following the strain after pushing on the box, and also while hooking the tongs to lift the box of merchandise which was being unloaded by the winch at the truck driver’s last destination; returning to the employer’s place of business that afternoon without reporting an accident to the management; exhibiting no outward emotion of any disabling condition on the way back to the warehouse to Jones or when he called at defendant’s office Friday afternoon or Saturday morning to get his check, no doubt it would have caused the doctor to have modified his diagnosis.
Finding no manifest error in the judgment appealed from the same is hereby affirmed.
Judgment affirmed.