229 So.2d 395 (1969)
Mrs. Vera MOAK, Widow of James Moak, Individually etc. et al.
v.
LINK-BELT COMPANY et al.
Nicholas PARATORE
v.
AMERICAN SUGAR COMPANY et al.
Donald R. MOFFETT
v.
AMERICAN SUGAR COMPANY et al.
Mrs. Celie T. SANTA MARIA, Widow of Eduardo Santa Maria
v.
LINK-BELT COMPANY et al.
John A. BREMERMANN
v.
The CONTINENTAL CASUALTY COMPANY et al.
Gerald Howard GILMORE
v.
AMERICAN SUGAR COMPANY et al.
Lloyd A. DICKINSON
v.
AMERICAN SUGAR COMPANY et al.
Mrs. Eula Mae McLAIN, Widow of Edgar McLain
v.
AMERICAN SUGAR COMPANY et al.
AMERICAN SUGAR COMPANY et al.,
v.
LINK-BELT COMPANY et al.
HODGES STOCK YARDS, INC.
v.
LINK-BELT COMPANY et al.
INTERNATIONAL COLD STORAGE, INC.
v.
LINK-BELT COMPANY et al.
Yvonne Bertaut BARONE, Individually etc. et al.,
v.
David POINDEXTER et al.
James E. FORTENBERRY
v.
AMERICAN SUGAR COMPANY et al.
Albert H. BERGERON
v.
AMERICAN SUGAR COMPANY et al.
Ivy P. BOUDREAUX
v.
AMERICAN SUGAR COMPANY et al.
LIBERTY MUTUAL INSURANCE COMPANY
v.
CONTINENTAL CASUALTY COMPANY et al.
Nat J. COMARDA
v.
LINK-BELT COMPANY et al.
NATIONAL FIRE INSURANCE COMPANY of Hartford et al.
v.
LINK-BELT COMPANY.
Nos. 3231-3248.
Court of Appeal of Louisiana, Fourth Circuit.
December 1, 1969.
Rehearing Denied January 12, 1970.
Writ Granted March 12, 1970.
*399 Jones, Walker, Waechter, Poitevent, Carrere & Denegre, John V. Baus, and Adams & Reese, W. Ford Reese and Joel L. Borrello, New Orleans, for Link-Belt Co. and Liberty Mut. Ins. Co.
Smith, Scheuermann & Jones, Benjamin E. Smith, New Orleans, for Mrs. Vera Moak, individually and as tutrix of Gilbert Donald Moak and Deborah Ann Moak (both minors), John Sanford, Mary Palmisano, Herman Phillip, John D. Bell, Nathaniel Dunbar, Robert Mason, Osa McDaniel, Joe Davis, Frank Schief, Jr., William Bordelon, Bertha Bordelon, Ralph Gonzales, Rita Gonzales, Claudia Hullfish, Sara Schiro, Herbert Frazier, Odessa Schellinger, Nicholas Iemolla, Bessie C. Pope, Arthur Barrios, Emile Barker, Robert Clark and Oliver Durel, with, on the brief, Ungar, Dulitz & Martzell, Stanley Jacobs, New Orleans, for Mrs. Celie T. Santa, Maria.
Schoemann, Gomes & Ducote, Eugene Gomes, Jr., New Orleans, for Nat. Fire Ins. Co. of Hartford.
Sehrt, Boyle & Wheeler, Edward J. Boyle, Jr., New Orleans, for Nat J. Comarda.
Marvin Grodsky, New Orleans, for Anthony Ponsetti.
Frank D'Amico, New Orleans, for Yvonne Bertaut Barone.
Christovich & Kearney, Alvin R. Christovich, Sr., New Orleans, for American Mut. Liability Ins. Co.
Bienvenu & Culver, P. A. Bienvenu and H. F. Foster, III, New Orleans, for Factory Ins. Ass'n, and, with others, for American Sugar Co.
Chaffe, McCall, Phillips, Burke, Toler & Sarpy, Harry McCall, Jr., and George A. Kimball, Jr., Sessions, Fishman, Rosenson, Snellings & Boisfontaine, Breard Snellings, New Orleans, for American Sugar Co., Continental Cas. Co., and Certain Underwriters at Lloyds.
John J. Cummings, III, Robert R. Gisevius, Jerald N. Andry, Gilbert V. Andry, III, New Orleans, and Chester Francipane, Metairie, for Nicholas Paratore, Donald R. Moffet, Lloyd A. Dickinson, Gerald Howard Gilmore, John A. Bremermann, James E. Fortenberry, Albert A. Bergeron, Ivy P. Boudreaux, Eula Mae McClain and Edward Jones.
*400 Henican, James & Cleveland, C. Ellis Henican and Carl W. Cleveland, New Orleans, for Hodges Stock Yards, Inc. and International Cold Storage, Inc.
Before CHASEZ, REDMANN and GARDINER, JJ.
REDMANN, Judge.
These eighteen consolidated cases arise out of the February 15, 1965 explosion and fire in the granulator house of the American Sugar Company refinery at Arabi, Louisiana.
The cases include:
First, suits against American and its insurers (and certain others) for personal injury and wrongful death by employees (or survivors) of Link-Belt Company or its subcontractors. Link-Belt was at the time of the explosion executing a contract for design, fabrication and installation of certain machinery systems in the granulator house.
Second, similar suits against Link-Belt and its insurers (and certain others) by American's employees or survivors.
Third, suits against American and Link-Belt and their insurers by neighbors of American for property damage and by a soft drink deliveryman for his injury.
Fourth, suit against Link-Belt and its insurers by American and its insurers for damage to American's plant, business interruption etc. In this suit Link-Belt reconvened for the amount of invoices allegedly due for work completed and for equipment delivered but not installed prior to the explosion.
Fifth, suit against Link-Belt by its electrical subcontractor for equipment lost in the fire.
American and Link-Belt and their insurers also claimed, by appropriate proceedings, indemnity or contribution against each other. They also sought reimbursement for workmen's compensation payments out of any recoveries by their respective employees or their survivors (in one case, by separate suit).
The judgments appealed from:
(1) allowed recovery to all the personal injury and wrongful death claimants against either American or Link-Belt (and their respective insurers), with reimbursement to the workmen's compensation payers, but dismissed the claims against certain defendants;
(2) allowed recovery to the deliveryman and the neighboring property owners against American and Link-Belt and their insurers;
(3) denied recovery to American and its insurers for its damages;
(4) allowed recovery to the subcontractor against Link-Belt;
(5) allowed recovery to Link-Belt for the invoices for work completed and equipment delivered but not yet installed; and
(6) denied indemnity or contribution to American and Link-Belt against each other and their insurers (except where they were cast in solido for the deliveryman's and the neighbors' damages).
Almost every party has appealed, in one respect or another, or has answered an appeal, from the judgments affecting him.
The trial court's fundamental conclusion was that the actual cause of the explosion was not proved, but that the explosion initiated in an area where American and Link-Belt exercised joint control, and this circumstance justified application of the doctrine of res ipsa loquitur against each of American and Link-Belt in favor of the personal injury claimants, and against both in favor of the deliveryman and the neighboring property owners; and that neither American nor Link-Belt rebutted the consequent inference against itself of negligence proximately causing the explosion.
The principal issues on appeal include whether the actual cause was proven, and if *401 not whether the application of res ipsa is proper and whether its inference of negligence has been rebutted. Other issues will be discussed in the course of this opinion.
In American's granulator house, where the explosion occurred, refined sugar was broken down and screen-separated into various sizes, stored in bins and packaged for shipment or simply moved out for bulk shipment.
The principal storage bins occupy a nearly square area, divided into four approximately equal sized north-south lines of rectangular bins designated, from west to east, the A, B, C and D bins. The A and B lines each have two large bins (capacity about 500,000 pounds each), and the C and D lines each have eight smaller bins (capacity about 125,000 pounds each). The smaller bins are designated C-1 (or D-1) through C-8 (or D-8), south to north. The bins extend from the second floor of the building near the ceiling into the fifth floor.
Stored sugar is removed from a bin by gravity bringing it through the bin's multifunnel-shaped bottom to a rake-feed or screw-feed device, which feeds the sugar into a screw conveyor running under that particular line of bins from south to north and emptying into a bucket elevator at the north end of that line of bins. Each line of bins has it own south-north screw conveyor emptying into its own elevator. The bucket elevator is a continuous belt to which many trough-like rectangular buckets are attached; the buckets scoop or receive sugar near the bottom of the elevator shaft and empty it at the top into other conveying systems which deliver it to the packaging machines or the bulk shipment receptacle such as a barge.
All of this movement of sugar generates sugar dust, which in sufficiently heavy concentrations is explosive. American took many precautions to reduce this hazard, not the least of which was the use of dust collectors both within the closed conveying system and also at the many packaging machines where the sugar left the closed conveying system and entered the open atmosphere in its course into the packages.
Nevertheless, the conveying systems are not airtight and the dust collecting systems are not (and perhaps cannot practically be) 100% efficient, and sugar dust did enter the granulator house's atmosphere, settling on beams, machinery, etc. throughout. (There is, however, no evidence suggesting that sugar dust was in the plant's atmosphere on the day of the explosion in any significant concentration.) Within the conveying system sugar dust is an expected concomitant of the moving of the sugar, and added precautions, such as static-conductive belts, magnets to trap stray bits of metal which might cause sparks, and pneumatic rather than electric conveyor gate controls, were taken.
Link-Belt was aware of the hazards involved when it undertook its contract, which expressly provided that American's operations in the granulator house would continue during performance of the contract. Link-Belt and American met weekly to schedule work so as to avoid conflict with each other.
Part of Link-Belt's contract required the replacement of the rake-feed devices immediately under the C and D bins with screw feeders. These new individual screws under each bin were taller than the rakes, and it was therefore necessary to lower and modify the existing south-north screw which extended the full 70-foot length of the bin lines to the bucket elevator. Each bin screw was operated through belts and pulleys by an individual electric motor, so that sugar might be extracted from one bin at a time. The 70-foot screw was a unit, and if sugar was being taken from any individual bin, the 70-foot screw was turning under all eight bins in the line. The various motors were all controllable from a totally automatic remote system to control sugar movement (provided by Link-Belt under the contract), which could also be set to permit manual *402 control of the motors for testing or other purposes.
Link-Belt was nearing completion of its contract by the day of the explosion. As part of its work became usable by American that part was turned over to American. Although some work in bin C-1 was still being done by Link-Belt, the conveyor system under the C bins had been completed with the exception that the belt guard for C-1's screw's motor was not installed and the mounting for at least one other guard required modification. (American argues that a change involving welding or burning was necessary in the C-2 bin's belt-guard's pipe-over-rod mounting system, due to a space problem at that south end of the line of bins. American's theory is that this necessary welding or burning was being done negligently and was the ignition source, through an open inspection port in C-1's feeder screw, for the explosion.)
The C bins except bins C-1 and C-2 were turned over to American sometime prior to the day of the explosion. But the conveyor system from the C bins had not been used prior to the day of the explosion except a week earlier to clear the bins of the sugar which had leaked into them from adjacent bins. This amounted to about a ton or a ton and a half in each bin (including C-1 and C-2), which was cleared by manual control of each motor used. When the C bins were full and emptied through the automatic system each would discharge 60 tons an hour.
Bins C-3 through C-7 had been filled over the weekend prior to the Monday of the explosion. No sugar had been placed in C-8 because there were some buckled boards in its bottom which required fixing.
Although one witness testified for American that the C bins had not received any special cleaning prior to placing sugar in them because the sugar was destined for reprocessing for syrup, another American witness testified they did clear debris out of the bins and also cleared out the leaked-in sugar as noted above.
In any case, part of the final cleaning out of bins and conveyors was purging them with sugar and this was being done on the day of the explosion. C-7 and C-6 had already been emptied, and C-5 was being emptied at the moment the explosion occurred.
The bottom of the bins, their individual feeder screws, the long conveyor screws to the bucket elevators and the work area catwalks alongside the long conveyors all projected through the second floor ceiling and were situated over part of the packaging area on the second floor. The bin portion of the second floor ceiling was about 30 inches higher than the rest of the second floor ceiling. On the third floor, over the lower portion of the second floor ceiling, there was situated the heat seal room, where teaspoon packets of sugar were packed. The heat seal room was separated from the bin area by a concrete block wall, and between that wall and the bins were large air conditioning ducts leading to and from the air conditioner coil house (itself situated on the fourth floor). But because of the difference in height between the two portions of the third floor, the heat seal room wall in that area was not rigidly isolated from the second floor area: one industrial engineer theorized that the blowing down of this wall was the result of explosive force from the area of the conveyors under the bins passing through the 30-inch differential in floor levels.
But, as noted, large air conditioning ducts were also situated adjacent to the heat seal room wall demolished in the explosion. One expert would trace the explosion from a pulsaire dust collector to the air conditioning coil house and then through the ducts adjacent to the heat seal room wall in explaining that wall's collapse. This pulsaire unit was situated east of the bins and partly on the third and partly on the fourth floor. Its intakes at packaging machines drew in air-conditioned air, and it removed the sugar dust and returned the cleaned air into the air *403 conditioning ducts on the fourth floor near the coil house.
However and wherever the explosion initiated, it was evident to the employees of American and Link-Belt and others at approximately the same moment, on all floors of the building which had any connection with the bins and the related equipment. Some witnesses testified of hearing two or more explosions in quick succession.
Many witnesses gave testimony of the first manifestations of the explosion as they observed it at their respective locations on various floors of the granulator house. But no individual's testimony establishes that the manifestations occurred first on one floor and then on another. Link-Belt argues one witness on the second floor saw a red glow on the third floor before anything occurred on the second; but that witness testified he, on the second floor, "fell down" at that moment, and never saw anything in the bin area on the second floor although many other witnesses did.
Our review of the record does not suggest to us any manifest error in the trial judge's conclusion that the cause of the explosion was not proven. There were, as he noted, many proven prior instances of negligence on the part of each of American and Link-Belt, but no proof of any specific negligence which actually caused the explosion here involved.

AMERICAN'S THEORY OF CAUSE
Charles Wayne Parish testified as an expert for American. His conclusion from his observations was that the explosion initiated in the C bins' bucket elevator where the 70-foot conveyor screw under those bins emptied. His theory of the ignition source is that negligent welding or burning of metal near C-1's feeder screw caused a piece of molten metal to fall through an open inspection port into C-1's feeder screw's opening into the C bins' 70-foot south-north conveyor screw, which was turning (throughout its length) to propel sugar from bin C-5 to the bucket elevator. There was a half inch clearance between the bottom half of the 70-foot screw itself and the closed, U-shaped trough through which it propelled the sugar; and in that half inch clearance sugar would remain. Pure sugar is extremely difficult to ignite (all experts agreed), but sugar to which sawdust, ashes or certain other impurities have been added can be ignited, and when ignited puffs up into a substance of greater volume than the original sugar. Parish's theory was that (in spite of the ton to ton and a half cleanout the prior week) the sugar in the bottom of the conveyor under C-1 was mixed with impurities, did ignite, and its burning, puffed-up product was propelled along by the moving screw, survived the smothering 60-tons-per-hour sugar discharge from C-5 and entered the bucket elevator's heavy sugar dust atmosphere causing the explosion.
Parish testified he had in fact succeeded in igniting contaminated sugar and conveying its burning product the length of a 10 or 12 foot screw conveyor; and that he had covered it with sugar for a period of time equal to that required for sugar to travel in American's system from C-5 to the bucket elevator, without the burning having been extinguished.
Parish's theory of the ignition depends, of course, on welding or burning below C-1, which the trial judge found unproven. There was testimony by comparatively few American employees, of the many who passed or were working in the area, of seeing flashes evidencing hot work being done near the second floor ceiling on the catwalk below and alongside the C bins by non-employees of American on the morning of the explosion. Link-Belt's employes testified that although some of them had briefly been on the catwalk by the C bins they did no hot work at that point that day (although they did on other floors). There was physical evidence, such as welding *404 rods, that at some time hot work had been done in that area, but this could have been a considerable time previous to the day of the explosion. The trial judge accepted the testimony of the Link-Belt employees and we simply cannot say he erred in doing so.
Furthermore, the helical ribs of the 70-foot conveyor screw were not continuous but interrupted, by four or five inch horizontal gaps where the screw axle was supported by bearings, at least twice in the distance between C-1 and C-5, where sugar was entering. Sugar would be propelled past these gaps by the force of the additional sugar following it, but the hypothetical burning mass from the half-inch sugar residue under C-1 would not have had such additional force following it; and Parish's uninterrupted screw's success does not prove that an interrupted screw would somehow propel the burning sugar across the gaps.
Parish opined contaminated sugar might have burned across the gap where the screw was interrupted, similar to a gunpowder trail though much more slowly. But the factual evidence that a ton or more of leaked sugar had been extracted from each bin during the previous week makes it doubtful whether the sugar in the trough was contaminated.
We agree with the trial judge that he could not fix the cause of the initial explosion on the basis of the inconclusive expert opinion testimony of Mr. Parish.
It is, however, worth noting that Parish testified that as an explosion front travels in any direction, obstacles in its path prevent or reduce its fire or heat's effects on the area behind the obstacle, somewhat like obstacles in the sun's rays' path cast a shadow shielding the shaded areas from the sun. Thus an object, such as a bracket within a conveyor, which is very charred on one side but much less so on the other indicates, Parish says, that the direction of the explosion's travel was from the charred side to the less charred side.
Parish further testified that he inspected the various elements of the bin-and-conveyor systems, and that the only point he found this shadow-effect indicating travel outward in all directions was within the C bins' bucket elevator where the C bins' 70-foot screw entered. (He agreed that some other cause, and not only the assumed welding under C-1, could also have caused the explosion.)

LINK-BELT THEORIES
Link-Belt presented two static electricity theories to explain the explosion.
Stratton Hammon would fix the initial explosion in the pulsaire situated east of the bins on the third and fourth floors. This unit obviously had suffered interior explosive force; its heavy, deep-ribbed metal top was bent outward, an interior metal quasi-partition was ripped open at its seam, and the explosion vent ducts themselves were split open by a force obviously too great to be dissipated through the vents alone. Yet the intake pipes of the pulsaire were not damaged, excluding the possibility (said Hammon) that the explosion had traveled to the pulsaire from the packaging machine dust intakes. (American's expert, Parish, contradicted this conclusion on the basis of his visual inspection of the interior of the nine-inch pipe leading to the pulsaire, which he had cut open ten feet from the unit.)
The pulsaire functions by drawing the dust-laden air through cylindrical cloth stockings which are kept spread out by heavy wire forms as the air is drawn from the stockings' cylindrical exteriors up through the interiors. The dust accumulates on the exterior of the stockings to a thickness of an eighth of an inch or so, by which time a strong reverse pulse of air is applied to one stocking at a time to blow off the thick accumulation of caked dust, which then falls to the bottom of the unit to be removed.
*405 Photographs of the pulsaire stockings lend support to Hammon's contention that a buildup of sugar on some of the stockings had occurred prior to the explosion, in excess of the small fraction of an inch expected in normal operation. Hammon referred to the U.S. Weather Bureau temperature and humidity statistics as supporting the next steps in his theory, when in fact the air drawn into the pulsaire was interior air conditioned air, controlled as to both temperature and humidity. But Hammon theorized that the relatively cold, dry day was conducive to static electricity generation by the dry sugar dust accumulating on the stockings; that the dry air within the pulsaire made the dust concentration more explosive; and that a stocking and its metal form, overweight because of excess sugar accumulation and overcharged with static electricity, fell from its metal connection and the static electricity discharged through a spark from the stocking assembly to the metal pulse tube. The spark, Hammon theorizes, ignited the sugar dust resulting in a small explosion which then travelled through the eight-inch hole left by the fallen stocking into the upper chamber of the pulsaire where a strong explosion occurred, causing the heavy damage previously described, including the bursting from the upper chamber down through the metal plate seam into the stocking chamber. That metal plate had scores of similar eight inch holes (through each of which a pulse venturi projected) for the many stocking assemblies, but its central portion's seam was split downwards. (Hammon also testified it was not essential to his theory that the stocking should have fallen; the electric charge could have gone through the stocking in place to the pulse venturi. But we believe one would not expect to find a concentration of sugar dust on the inside of the collecting stocking, since the dust would already have been filtered out of the air there.)
We agree with the trial judge that Hammon's theory of the cause of the initial explosion is not convincing, both because of his apparent reliance on inapplicable exterior weather conditions and also because of the contradiction by Parish of Hammon's factual conclusion that there was no indication of explosion-front passage through the intake pipe towards the pulsaire. Hammon did not have the benefit of observing the interior of that pipe ten feet before its entry to the unit, as Parish did by cutting it open.
Another Link-Belt theory was expounded by Zion Segall. His view was that the falling of sugar into the B bins at the rate of 50 to 100 tons an hour generated static electricity which discharged into the sugar dust created by the falling sugar and created the initial explosion within the B bin, under the relatively low temperature and humidity conditions present.
Segall also opined the explosion could have occurred in bin C-5 if there were movement of sugar there.
Segall's personal inspection of the damaged plant was not as thorough as that of Hammon (nor that of Parish, who spent the greatest amount of time in his inspection). It is perhaps true that Segall did not have the opportunity to fully evaluate some possibilities, specifically Hammon's theory which had not been articulated to him until a few days before he testified.
In any event, the B bins had been in use for many years and Segall's theory does not depend on any malfunction of any equipment or other unusual circumstances other than the weather, which was not shown to be of so unprecedented a nature that it would not have occurred on many other occasions in the plant's history. We agree with the trial judge that this theory is unsatisfactory as a basis for determining liability.
Link-Belt also suggests as possible causes (not rendered probable by any evidence related to the time of the explosion) stray metal causing a spark in a conveyor or crusher, an overheated bearing, an *406 electric arc in an electric motor in the third floor powdered sugar room, etc.
We think there would be little value in our discussing the many, many other circumstances which, counsel argue, tend to support or discredit any of American's or Link-Belt's theories of causation. These theories of their experts indicate possibilities, among which we think the Segall theory is the most remote. But in our opinion neither of the Parish and Hammond theories is sufficiently supported by the factual evidence to render it very probable, or more probable than the other. We conclude that the initial cause of the explosion remains uproven.

RES IPSA LOQUITUR
"A determination of a proper instance for application of the principle of res ipsa loquitur has been the subject of volumes of discussion by learned jurists and legal scholars, who have been at pains to point out that the maxim means only that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that the rule rests for its justification upon the common experience that accidents from such causes do not commonly occur in the absence of negligence; and that it is the lack of direct evidence indicating negligence on the part of the defendant as the responsible human cause of a particular accident which actually furnishes the occasion and necessity for invoking the rule in its strict and distinctive sense. It is generally conceded that res ipsa loquitur in no way modifies the rule that negligence will not be presumed. The application of the rule does not, therefore, dispense with the necessity that the plaintiff prove negligence, but is simply a step in the process of such proof, permitting the plaintiff, in a proper case, to place in the scales, along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of negligence, thereby obtaining an advantage and placing on the defendant the burden of going forward with proof to offset that advantage. When all the evidence is in, the question is still whether the preponderance is with the plaintiff. All that is meant by res ipsa loquitur is `that the circumstances involved in or connected with an accident are of such an unusual character as to justify, in the absence of other evidence bearing on the subject, the inference that the accident was due to the negligence of the one having control of the thing which caused the injury. This inference is not drawn merely because the thing speaks for itself, but because all of the circumstances surrounding the accident are of such a character that, unless an explanation can be given, the only fair and reasonable conclusion is that the accident was due to some omission of the defendant's duty.' [Anno., 53 A.L.R. 1494, 1499.]" Larkin v. State Farm Mutual Auto. Ins. Co, 233 La. 544, 97 So.2d 389, 391 (1957).
(For an interesting and thorough discussion of the contrary thesis that res ipsa is a presumption of substantive law placing the burden of proof on defendant, see Shain, Res Ipsa Loquitur: Presumption and Burden of Proof.)
We may say preliminarily that defendants here do not dispute that some negligence, by some person, is fairly inferred from the fact of the explosion. But defendants each insist that (1) the instrumentality which caused the explosion must be identified and (2) its exclusive control must be shown to be in one of them, to justify the inference that that one's negligence caused the explosion. If control was in both, each argues, the only correct inference is that one, or the other, or both negligently caused the explosion, which is not in logic or in law sufficient to justify a conclusion that one (the particular defendant) is liable.
Defendants' conclusion is, in effect, that neither is liable, and that, were *407 it not for workmen's compensation, none of the injured individuals could recover. But if the inference is one or the other or both (and not "or neither", as the Larkin case hypothesized at one point in discussion), the one conclusion that is sure to be wrong as a matter of logic is that neither is liable.
If American were alone in its plant filled with complex machinery networks generating explosive sugar dust, we would not hesitate to apply res ipsa against it. That something went wrong is beyond dispute, and if American were in exclusive control and exclusively responsible for everything we would quickly infer that some negligence by American had caused the damage, regardless of what instrumentality within the plant caused the explosion, which we think would have been immaterial.
The mere showing of the presence of an independent contractor, such as the rodent control operator who made his rounds shortly before the explosion, would not in our opinion invalidate the conclusion of causative negligence by American. Yet in terms of possibility only, it is conceivable the rodent controller somehow caused the explosion; and American is not responsible for its independent contractors' negligence. Perhaps the most obvious reason this contractor's presence is insignificant is that there is no suggestion he had any control whatever over the machinery, etc., in which or part of which is the source of the explosion.
The situation is more complicated because of the permeating presence in the granulator house bin area of Link-Belt, an independent contractor under a contract for a massive redesign and reconstruction of about half of the sugar conveying machinery systems. The nature and extent of Link-Belt's presence, compared to that of the rodent controller, makes it enormously more possible that Link-Belt's negligence could have caused the explosion.
Nevertheless, we believe that in principle the validity of an inference of negligence on American's part is not affected by the mere showing of the presence of an independent contractor. Except for Link-Belt's presence, American had control of its entire complex plant and its explosive sugar dust. We believe American must be presumed to remain in control of the entire plant including the instrumentality which caused the explosion, except to the extent it shows Link-Belt was exclusively in control. And the evidence does show that Link-Belt was, from time to time, in exclusive control of many parts of the plant's machinery including that which we conclude was the source of the explosion.

The Instrumentality
The trial judge made "the factual conclusion that an instrumentality under the joint control of Link-Belt and American Sugar, by reason of a negligent act on the part of one or the other, or both, caused the damage suffered by all parties."
The trial judge concluded that the initial explosion occurred "somewhere between the north wall of the packaging department on the second floor and the southern extremity of the bin area within, around, alongside or under the B and C bins." This conclusion is supported by the many witnesses who were spread throughout the second floor, who testified the first manifestation of the explosion was noise and a great ball of fire coming down from the ceiling in the area of the bottom of those bins (and of course their conveyor system underneath them).
American and Link-Belt argue that the evidence at best shows joint control in the area of the explosion and is therefore insufficient; that there must be shown an identified instrumentality which caused the damage. Even assuming this position were fully applicable in the case of an explosion of the proportions here against a defendant so completely enmeshed in *408 control throughout the area, we believe the instrumentality is identified as the conveyor system under the C bins.
We are impressed by the explosion-front shadow-effect testimony of American's expert Parish, and his factual testimony of his observance of the dark-light sides of obstacles, indicating, his expert testimony reasons, the direction of explosion travel in all directions away from the boot of the C bins' bucket elevator where the 70-foot C screw conveyor entered at its north end. We think his testimony added to that of the witnesses on the second floor at the moment of the explosion justifies narrowing the area of the explosion to the C bins' conveying system including the bucket elevator, and specifying that conveying system as the instrumentality which caused the damages.

Control of the Instrumentality
The conveying system underneath those bins had been revamped and refabricated completely by Link-Belt, with much new equipment and modification and relocation of old. The bins themselves were the subject of work by Link-Belt, including sugar-level indicators, access doors and ladders; and a great deal of other equipment related to the flow of sugar into and away from the bins was to be modified and remote-controlled under the contract. The contract had been 80 to 90 percent completed by the time of the explosion. Even though Link-Belt had completed most of its work on this particular system months earlier, the day of the explosion was the first fully operational use of the system, and the intervening period of nonuse cannot so negate the logical implications of Link-Belt's control as to render unwarranted the inference, from the fact the first real use resulted in explosion, that Link-Belt was somehow negligent in its great involvement in designing and refabricating the bulk of the system; see Plunkett v. United Elec. Serv., 214 La. 145, 36 So.2d 704, 3 A.L.R.2d 1437 (1948); also Motor Sales & Serv. v. Grasselli Chem. Co., 15 La.App. 353, 131 So. 623 (1930). In Plunkett, defendant had provided and installed a central heating unit in plaintiff's home 39 hours before the unit set fire to plaintiff's house, and in spite of defendant's argument that control was in plaintiff rather than defendant, res ipsa was applied. The Supreme Court stated, at 36 So.2d 711,
"* * * plaintiff is required to establish with certainty that the instrumentality installed by defendant is the source of the damage; that he was without fault and that the time elapsing between the installation and the damage was such as to make it reasonably evident that the damage would not have been caused if the device had been free from defect and had been properly installed. * * *"
We are satisfied that here the lapse of time, because the machinery was never in use, does not destroy the validity of the inference against Link-Belt. The nonuse distinguishes this case from West v. Hydro-Test, Inc., 196 So.2d 598 (La. App.1967), and Kansas City Fire and M. Ins. Co. v. Bituminous Cas. Corp., 209 So. 2d 785 (La.App.1968), where the device manufactured or installed by defendant had been in use for several months or a year prior to plaintiff's damage. See also Hake v. Air Reduction Sales Co., 210 La. 810, 28 So.2d 441 (1946).
American, on the other hand, was actively controlling the machinery system at the time of the explosion, by actually operating it to convey sugar a ton a minute.
Thus we conclude there was control in both American and Link-Belt sufficient to make res ipsa applicable.

Control by Two Persons
In some of the cases cited by defendants as denying res ipsa where there are multiple defendants, or where only one of multiple logical defendants is sued, the *409 plaintiff was in a position of at least some control of the instrumentality; A. & J., Inc. v. Southern Cities Distr. Co., 173 La. 1051, 139 So. 477 (1932); Morales v. Employers' Liab. Assur. Corp., 202 La. 755, 12 So.2d 804 (1943); Dorman v. T. Smith & Son, 223 La. 29, 64 So.2d 833 (1953). In those cases the inference that plaintiff was negligent was at least equally probable under the circumstances, and thus the inference against defendant in favor of that plaintiff was unwarranted (or no more warranted than an inference of contributory negligence against plaintiff). (Still, a plaintiff in control whose proof negates any inference against itself may have the benefit of an inference against the defendant; Plunkett v. United Elec. Serv., supra.)
For example, in Dorman, plaintiff was a shipping company clerk who personally had supervision and control of stacking goods, and was refused a res ipsa inference against the stevedoring company which actually stacked the goods which shortly fell on plaintiff. This case does not suggest any reason to deny application of res ipsa in favor of an injured third party plaintiff, against either shipping or stevedoring company or both.
Other cases cited by defendants involved circumstances suggesting two or more at least equally probable causes of the damage, where defendant had control of only one; Cavaretta v. Universal Film Exch., 182 So. 135 (La.App. 1938); Shields v. United Gas Pipe Line Co., 110 So.2d 881 (La.App.1959); Schulingkamp v. Bolton Ford, Inc., 163 So.2d 161 (La.App.1964), writ refused; Ewen v. Bloch, 173 So.2d 314 (La.App.1965), writ refused; Tarbox v. Eason, 179 So.2d 916 (La.App.1965); Brechtel v. Gulf States Elev. Corp., 195 So.2d 403 (La.App.1967). But these cases do not prevent applying res ipsa against multiple defendants (or one defendant) where defendants did have control of the instrumentality which caused the damage.
In Beck v. United States Fid. & Guar. Co., 76 So.2d 120 (La.App.1954), cert. denied, a customer was injured when a bottle of coca-cola fell to the floor as a store employee was removing a six-pack carton from a wooden case supplied by the bottling company. Our defendants consider the case no authority for res ipsa against multiple defendants, because of the circumstances that counsel for both the store's insurer and the bottling company agreed plaintiff was entitled to recover, but each insisted the other was liable. There is merit to this argument, yet there simply was no possibility a third party caused the accident, and in fact the case proceeded on the theory that each defendant had to rebut a res ipsa inference. The bottling company successfully rebutted the inference. While the court explicitly asserted counsel's agreement of plaintiff's right to recover, and the bottler's exculpation, as leaving only the store's insurer to respond in damages, the court also declared, on application for rehearing, at 76 So.2d 125, "the unquestioned propriety" of applying res ipsa, and stated the burden was upon each defendant "to free itself from the imputation of negligence."
In Meyer v. St. Paul-Mercury Indem. Co., 61 So.2d 901 (La.App. 1952), a patient injured during an operation sued the oral surgeon and the anesthesiologist, and in fact the case proceeded on a res ipsa basis, with both defendants exculpating themselves.
In Arrington v. Hearin Tank Lines, 80 So.2d 167 (La.App.1955), plaintiff was damaged by fire resulting from the ignition of crude oil which had leaked from a storage tank owned by one defendant but being emptied into tank trucks owned by another defendant. Plaintiff's petition merely alleged control and supervision in both defendants, relying on res ipsa. The court held the petition stated a cause of action, and again, the case in fact proceeded on the theory that each defendant had to exculpate itself.
In several cases where collisions between two motor vehicles damaged an innocent *410 third party, res ipsa has been applied to oblige each defendant to exculpate himself. In Weddle v. Phelan, 177 So. 407 (La.App.1937), both defendants were held liable on failure to exculpate themselves. More often, after in fact proceeding on the theory that each defendant must exculpate himself, the cases have concluded that one has done so, by proving the negligence of the other; Gauthreaux v. Hogan, 185 So. 2d 44 (La.App. 1966); Sussdorff v. Jackson, 203 So.2d 901 (La.App.1967). Other cases have similarly obliged each vehicle operator to exculpate himself, without referring to res ipsa; Insurance Co. of N. America v. Gore, 106 So.2d 471 (La.App. 1958); Emmco Ins. Co. v. Liberty Mut. Ins. Co., 138 So.2d 822 (La.App.1962). In all of these vehicle cases, whether or not res ipsa is referred to, the fact is that the pure logical inference is not that both defendants were negligent, but rather that one or the other or both were negligent. Defendants here contend that these vehicle cases from the Courts of Appeal must be disregarded because of an expression by our Supreme Court in Larkin v. State Farm Mut. Auto. Ins. Co., 233 La. 544, 97 So.2d 389, 392 (1957). The Court's statement was that "an accident due to a collision between two private vehicles is not, in the absence of further proof, a proper occasion for application of the rule" of res ipsa (emphasis supplied). We believe this statement does not impliedly overrule the cases cited above, in which there was "further proof".
In other jurisdictions res ipsa has been applied against multiple defendants; Ybarra v. Spangard, 25 Cal.2d 486, 154 P.2d 687, 162 A.L.R. 1258 (1944); Meny v. Carlson, 6 N.J. 82, 77 A.2d 245, 22 A.L.R. 2d 1160 (1950); Ozark v. Wichita Manor, 252 F.2d 671 (5 Cir. 1958), applying Texas law; Domany v. Otis Elev. Co., 369 F.2d 604 (6 Cir. 1966), applying Ohio law. Those cases cite other authorities to the same effect.
In the case before us, American had full control of the conveyor system which somehow caused the explosion, at the moment of the explosion; and Link-Belt had had full control during refabrication and its responsibility for its prior full control was not extinguished by the period of nonuse prior to the disastrous first full use of the system by American.
We conclude the rule of res ipsa loquitur warrants the inference that both American and Link-Belt were guilty of negligence causing the explosion, and that the inference is valid against each.

Non-Joinder
Defendants argue that res ipsa loquitur cannot be invoked in a suit where only one of multiple logical defendants is sued. The Louisiana cases cited as supporting this position in principle have been referred to above, and we view those cases merely as finding the inference unwarranted on their facts.
Defendants also cite Corcoran v. Banner Super Mkt., Inc., 20 A.D.2d 552, 245 N.Y.S. 2d 175 (1963), which declined, with two judges dissenting, to apply res ipsa in a suit against a building owner for damages from a falling board which had been affixed to defendant's building and an adjacent building. Although that court considered both owners had control and recognized New York's application of res ipsa against multiple defendants, it did not explain why an inference which was obviously good against both (not "one or the other") should not be applied against one. Very plainly that court indicates if both owners were before it, it would hold both liable because of a res ipsa inference, in the absence of exculpatory evidence. We fail to see how the one owner could be done any injustice by the absence of the other in such a case, since presumably the other's evidence would be directed towards exculpating itself only, and towards placing the fault on the first defendant. We are not persuaded by the Corcoran case.
*411 We do find the suggestion in Weddle v. Phelan, supra, at 177 So. 411, that in two-vehicle collision cases an injured third party could not invoke res ipsa against one operator alone. But in such cases, it simply cannot be said that a collision between A and B warrants an inference that A was negligent. (The inference where available is A or B or both, and policy requires both to provide the evidence to show the actual negligence or freedom from negligence.)
In the cases where American is the sole principal defendant, it can be said that the evidence does warrant the inference from American's active complete control, that American was somehow negligent. And where Link-Belt is the sole principal defendant, it can be said that the evidence does warrant the inference, from Link-Belt's control in refabrication etc., that Link-Belt was somehow negligent. Where both are defendants against the neighbors' property damage claims and the deliveryman, the inference is valid against both.
Perhaps it should be pointed out again that of the two logical principal defendants in each class of personal injury case, one is the employer of the plaintiffs, not subject to being made a tort suit defendant because of the exclusiveness of workmen's compensation, LSA-R.S. 23:1032. Yet by third party demands for indemnity or contribution, or for compensation reimbursement, the employer may in some sense actually be a party. In any case, we cannot interpret the workmen's compensation law so as to deny a workman a right to recover against a third party joint tort-feasor.
We repeat that the test is that stated in Larkin, whether the inference of negligence is warranted. If so, the fact that another's negligence may have concurred in damaging plaintiff is no reason why he cannot sue defendant alone, just as in any other case of joint tort-feasors.

Inference Not Rebutted
Because in Louisiana, as Larkin points out, the question whether res ipsa applies is decided after all the evidence is in, our discussion of its applicability has been made after considering all the evidence. In any case neither American's nor Link-Belt's evidence exculpated either; the inference of negligence by each has not been invalidated.

STATUTORY EMPLOYER DEFENSE
A special defense in the personal injury and wrongful death suits against American is that American claims to be the statutory employer of its contractor's (and their subcontractors') employees, who would therefore be entitled to workmen's compensation benefits against American, LSA-R.S. 23:1061, to the exclusion of any other remedy against American, LSA-R.S. 23:1032.
LSA-R.S. 23:1061 provides, in part,
"Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; * * *."
Thus the question here is whether the work American contracted to have performed was part of the trade, business or occupation of American.
American cites Thibodaux v. Sun Oil Co., 40 So.2d 761 (La.App. 1949), both for its statement of the liberal interpretation of *412 the workmen's compensation law required to afford its intended benefits and for holding a principal liable to a contractor's employees even where the principal has never directly undertaken the same kind of work. We recognize the liberal interpretation requirement, but we distinguish our case from the situation there, where the principal could not be in the business of drilling wells and producing oil at all unless he personally or by contract, in the recurring operation of his business, does all that is necessary to produce the oil from the ground, including the contracted-out reworking of the well and fishing out of tools and implements stuck in the well. Here, American could have continued to operate its business of refining and packaging sugar indefinitely without reconstructing its conveying systems as it contracted with Link-Belt to do.
American shows it has itself on other occasions done some of the same kind of work involved in the installation portion of Link-Belt's contract to design, fabricate, install, etc. American has in the past installed a conveyor system with its own labor, although not of this magnitude or complexity. The fully automated system Link-Belt was to provide was a new kind of system. The contract was not for mere maintenance or repair of an existing system, nor the mere replacing of an occasional conveyor screw or other parts of a system.
We agree with the trial judge that the evidence of American's prior activities does not show that the Link-Belt contract work was part of American's trade, business, or occupation within the meaning of LSA-R.S. 23:1061. American's business was the operation of a sugar refinery, and it so operated its business as to include necessary maintenance and repair and occasional replacement of equipment. Complete redesign and reconstruction of the mechanical systems is not part of the operation of a refinery, and American did not make it part of their operation.
"Whether contracted work is part of the `operation' of the business (as opposed, e. g., to original construction or reconstruction of one of its facilities) has been utilized as a factor in determining whether the work is a part of the business within the meaning of § 1061 in Horrell v. Gulf & Valley Cotton Oil Co., 15 La. App. 603, 131 So. 709, and was emphasized as a determining factor in Finn v. Employers' Liability Insurance Corporation, La.App., 141 So.2d 852, 869. * * *" Doss v. American Ventures, Inc., 224 So.2d 470, 476 (La.App.1969), writ refused.
In Doss likewise we treated operation as a significant factor, holding ordinary maintenance and repair by the lessor was ordinarily part of the operation of the business of renting property, and reconstruction was not; and we remanded for determination of the kind of repair involved.
In Richard v. United States Fid. & Guar. Co., 247 La. 943, 175 So.2d 277, 286 (1965), and Speed v. Page, 222 La. 529, 62 So.2d 824, 828 (1952), our Supreme Court has held that an employer in a hazardous business is liable in compensation to his own employees involved in reconstruction (which is obviously not ordinarily his business), where the employer himself undertakes reconstruction "rather than have it done under contract." The plain implication of the quoted dicta is that even a hazardous business operator might undertake reconstruction (of his place of business or his business equipment or machinery) by contract without becoming liable for compensation.
In Ponthieux v. Lindsay, La., 226 So.2d 482, 484, 485-486 (1969), the court observes:
"It is, of course, well established that the purpose of LRS 23:1061 is to prevent the evasion of the compensation provisions of the law by contracting out part of the principal's regular and hazardous occupation or his contractual obligation and, therefore, he is not liable in compensation *413 unless he would have been obligated had he himself undertaken to do the work and hired the injured employee himself. This is pointed out, because in some of the cases hereinafter cited a plaintiff-employee was engaged to do hazardous work by an independent contractor, while in others he was hired to do it by the principal himself.
* * * * * *
"We conclude, therefore, that if it can be said that this defendant was engaged or intended to engage in any occupation (other than that of an insurance agent) it was the business of leasing residential property. That is a non-hazardous occupation, and the mere isolated use of a casual contractor to move and repair some rental units did not constitute his doing business as a contractor or repairer of buildings. Nor did it convert his otherwise non-hazardous business into a hazardous one." (All emphasis supplied.)
We believe that the emphasized language of Ponthieux does not warrant the conclusion that, since American would have been liable in compensation as a direct employer under the Speed and Richard decisions, it is therefore liable as a statutory employer. The Speed and Richard reasoning is not that the reconstruction becomes part of the hazardous employer's trade, business or occupation, but merely that the employer whose business is already hazardous and who is therefore already liable in compensation to his ordinary employees remains liable in compensation to employees hired for reconstruction. Thus we conclude that the dicta of Speed and Richard is unaffected by Ponthieux, and although American would have been liable in compensation as a hazardous employer had it directly undertaken reconstruction "rather than have it done under contract", American is not liable in compensation to employees of an independent contractor it engages for reconstruction work which is not part of its business.
O'Brien v. Columbian Carbon Co., 109 So.2d 285 (La.App. 1959), is perhaps the strongest case in favor of American's position. There, however, it appears the company had on several occasions constructed its own plants, and its construction engineer testified the company "is in the business, has been in the business, of designing, constructing, operating, maintaining" such plants. The court concluded construction was "an integral part of the business of the defendant." In our case American has engaged on at least one occasion in work which is somewhat similar, yet the Link-Belt contract called for full automation which American had never done, and complete revamping and rebuilding which the evidence does not disclose American had made part of its operation.
We believe the trial judge did not err in his factual conclusion that the work contracted to Link-Belt was not part of the business of American, and that his rejection of the statutory employer defense is correct.

INDEMNITY
There can be no tort indemnity in favor of a third party against an employer liable under the workmen's compensation law, whose liability for injuring his own employee is limited to compensation, LSA-R.S. 23:1032; Gros v. Steen Prod'n Serv., Inc., 197 So.2d 356 (La.App. 1967); see also Hebert v. Blankenship, 187 So.2d 798 (La.App.1966); Sanderson v. Binnings Constr. Co., 172 So.2d 721 (La.App.1965).
American claims contract indemnity against Link-Belt under their contractual agreement to indemnify and hold American harmless against all losses, judgments, etc. resulting from Link-Belt's performance "where the contractor or its subcontractors are at fault." While American argued Link-Belt alone was at fault, and American only vicariously responsible for Link-Belt's fault, this is not our conclusion. We hold American liable on a res ipsa inference arising from its control, and neither *414 its nor Link-Belt's inferred negligence is determinate as constructive or actual. Thus American has not proven that its liability is the result of Link-Belt's actual fault, and American is therefore not entitled to indemnity under the contract.

CONTRIBUTION
The cases cited as denying indemnity also refused demands that an employer be cast for contribution of his full theoretical virile share of a tort judgment.
The solidarity of the obligation of the employer and a third party concurrently actually negligent arises from their negligent breaches of duty towards the employee. Since the employer's liability for such breach is limited to compensation, his negligence can no longer serve as a foundation for solidary liability (at least in excess of his compensation liability). Thus the entitlement of the third party to contribution of a virile share, based on a now non-existent full solidarity, must fall.
But we do not find any discussion or ruling on the question whether a partial contribution or quasi-contribution, to the limited extent of the employer's compensation liability, is not available under some circumstances.
The serious problem we see can be indicated by supposing an employer and a third person concurrently injure an employee to an actual extent of $100,000. Except for the workmen's compensation law, the employee might have obtained a solidary judgment for $100,000 against both, and executed against either, in which case the other would have been liable in contribution for half (his virile share), or $50,000. Since the workmen's compensation law has been in force, the theory has been that the employer is no longer liable in tort but since "joint tort feasors" (General Elec. Co. v. Cuban Am. Nickel Co., 396 F.2d 89, 101 (5 Cir. 1968), suggests the employer now is not one) are each liable in solido for the whole damage, the employee can recover the whole $100,000 against the third party, and the employer gets reimbursement of his compensation payment out of that $100,000. The result would be that the employer who was concurrently negligent and would have paid $50,000 now pays nothing, and the third party who would have paid only $50,000 now pays the full $100,000. As a minimum, we believe, the compensation law was not intended to afford to an employer who is at fault a complete escape from all final liability; as a minimum, we believe, partial contribution or quasi-contribution should be available against the employer to the extent of his own reimbursement for compensation payments.
(The tort-to-compensation law change is more drastic if the third party would under tort law have been entitled to full indemnity for the whole $100,000, and would thus have finally paid nothing. Under theoretical solidary liability, he now would pay the whole $100,000, from which reimbursement for compensation payments would be made to the actually negligent employer against whom indemnity is no longer available. Thus theoretically compensation law might change the final result from employer pays $100,000 and third party $0, to third party pays $100,000 and employer $0!)
Whether the workmen's compensation law's removal of the employer's tort liability may be said to effect a division of the solidary obligation among joint tort-feasors or a discharge in favor of the employer-coobligor under LSA-C.C. art. 2101 or 2203 (see Comment, 2 La.L.Rev. 365 (1940), extracted following LSA-C.C. art. 2100, explaining these articles' interrelation) we find not previously discussed. If this were the result, the injured employee could not recover his damages against the remaining joint tort-feasors in solido except after first dividing the debt and deducting the share of his released employer. Thus, in our example, he would recover only $50,000 from the third person, having deducted the half share of the employer.
*415 (And if the case were one where the employer were liable in indemnity, LSA-C.C. art. 2205 would allow the remission of the principal debtor to discharge the surety, which the vicariously liable third party is, LSA-C.C. art. 2106; see Truxillo v. Gentilly Med. Bldg. Inc., 225 So.2d 488 (La. App.1969); see also LSA-C.C. art. 3061. Thus the third party who is only vicariously liable might be thought to escape liability, as he ultimately would have under pre-compensation tort law if the employer were solvent. On the other hand, if the employer's tort liability would have been only vicarious for the third party's actual negligence, the employer would be considered as a surety under art. 2106, and the release or discharge of him as a surety would not discharge the principal debtor, art. 2205; thus the third party against whom the employer would have had indemnity would remain liable for the whole $100,000, and the employer would receive reimbursement of his compensation payments, restoring both parties to their pre-compensation tort law positions.)
In the present case, however, we conclude we need not consider contribution in the light of the Civil Code theories just discussed, because the stipulations as to quantum on personal injuries do not specify what the actual amount of damage was. Instead they specify in every case that if judgment were rendered in favor of the particular claimant "against any defendant," the amount should be the stated amount, and the workmen's compensation payer "is entitled to" judgment for a stated amount of the workman's recovery. (The wording varies among the stipulations, but this is the import of each stipulation.)
Thus, although we are required to render whatever judgment is just, legal and proper on the record on appeal, LSA-C.C. P. art. 2164, we are not in a position to consider whether defendants' demands, for reversal of the personal injury judgments and alternatively for indemnity or contribution, justify any reduction in the amount of the personal injury judgments on a theory of division or remission of a solidary coobligor.
We are, however, persuaded that the exclusiveness of workmen's compensation was never intended to allow an employer to escape all final liability, even for workmen's compensation, where under tort law he would have been solidarily liable as a joint tort-feasor against whom contribution (or worse, indemnity) would have been available. His liability was intended by that law to be reduced, from his virile share of the solidary obligation, to the amount of the compensation payments but no further. And that is as far as his immunity to contribution (where it is otherwise due) can go.
In our opinion the evidence validating the res ipsa inference against each defendant shows their negligence was concurrent, and neither has been held merely vicariously liable for the negligence of the other. Since the stipulations on quantum do include reimbursement of compensation payments, we hold that each principal defendant is liable for contribution (not to exceed its virile share of one half) to the extent of the compensation payments it was liable for and it or its subcontractor or their compensation insurance carrier recovers in reimbursement from the workman's recovery. In a case where the employee's judgment includes an amount to be reimbursed for compensation payments, to interpret LSA-R.S. 23:1101 to refuse contribution to the limited extent of the compensation payments, where under prior tort law contribution for full virile share was available, would constitute a taking of property without due process of law in violation of La.Const. art. 1, § 2.
(This holding does not, of course, affect the conventional subrogations for the amount of medical payments advanced in excess of the statutory liability.)
The employer who has insurance against workmen's compensation liability should of course be entitled to recover *416 the amount of this contribution from that insurer (or from his subcontractor or its insurer, LSA-R.S. 23:1063, since it is precisely the compensation liability which we enforce thereby. We do not inquire whether set-off or compensation (LSA-C.C. art. 2207) occurs in an appropriate case, because of the stipulations that judgments for reimbursement should be rendered. Thus we complete a circuitous route in granting reimbursement as stipulated, then allowing contribution against American or Link-Belt as employer or statutory employer, the net effect of which is that (within contribution's ordinary limit of one half) the original payer of workmen's compensation will bear the cost of the compensation (under our circumstances of concurrent negligence).

NEIGHBORING PROPERTY DAMAGE
The neighbors' property was damaged by the negligence of both American and Link-Belt, inferred under the res ipsa doctrine. The judgments in the neighbors' favor are correct. We need not discuss their suggested alternate bases for recovery, such as sic utere tuo, LSA-C.C. art. 667. Defendants (and their respective insurers) having been cast in solido, either against whom judgment is executed is entitled to contribution of half from the other (and its insurers).

NON-EMPLOYEE PLAINTIFF
One individual, a coca-cola deliveryman, was injured in the explosion. For the same reasons the neighbors recover their property damage, the judgment in his favor against both defendants is affirmed.

EXECUTIVE LIABILITY
There was no showing of negligence by corporate officers causing the damage, nor is any res ipsa inference available under the evidence against any of them. The judgments dismissing suits against them and their alleged insurers are correct.

INSURANCE INSPECTION SERVICE
Also made defendant was Factory Insurance Association, which provided insurance inspection of American's plant and made recommendation to American and its insurers as to safety conditions, remedial measures and the like.
There is no evidence and no inference of negligence on F.I.A.'s part causing the explosion, and the claims against F.I. A. were properly dismissed, even assuming that their inspection service entailed duties towards the personal injury claimants the breach of which might have made F.I.A. liable.

AMERICAN v. LINK-BELT
American and its insurers claim recovery against Link-Belt and its insurers for several million dollars in property damage and also for business interruption loss occasioned by the explosion and fire.
American asserts both that it has proved Link-Belt's negligence as the cause of the explosion, and alternatively that the doctrine of res ipsa loquitur is applicable in its favor against Link-Belt.
We have already discussed the evidence and hold it does not establish the actual cause of the explosion. But because of American's strenuous insistence that it did prove its case by circumstantial evidence within the rule of Naquin v. Marquette Cas. Co., 244 La. 569, 153 So.2d 395 (1963), we discuss that case briefly here.
In Naquin, the suit was for damages from an explosion and fire in an apartment. There was a dime-sized hole in a gas service pipe located eight feet from the apartment, and the apartment windows *417 had been left slightly open. "The record is barren of any other proven source of escaping gas." (153 So.2d at 398.) The court's emphasis of that source having been proven distinguishes that case factually from ours, where we find no error in the trial judge's conclusion that American's theoretical source, Link-Belt welding, was not proven.
Naquin's statement that circumstantial evidence, as satisfactory proof of a claim, need not negate all other possible causes does not mean that the first mere possibility suggested wins. It means, as the court initially says at 153 So.2d 397,
"Causation may, of course, be proved by circumstantial evidence. * * * Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. * * *"
Here we do not hold that mere possibilities suggested by Link-Belt set aside circumstantially proven causation, but rather that American does not circumstantially prove the causation it theorizes.
In regard to the application of res ipsa, we have said the evidence warrants the inference that Link-Belt was somehow negligent, but equally warrants the inference American was negligent. American's theory of res ipsa here is that the only instrumentality which could have caused the explosion was a welding torch or arc, and that Link-Belt had exclusive control of such instrumentalities in the area. We disagree with both premises, for reasons more fully discussed earlier.
Res ipsa is not applicable in favor of American because the inference from the evidence here is that American's negligence concurred in causing its damage. American has not established as more probable the inference that Link-Belt's negligence alone caused the explosion.

Link-Belt's Reconvention
By reconventional demand Link-Belt sought and obtained judgment for the balance due from American for material delivered and work performed at the time of the explosion.
American does not dispute the accuracy of the invoices. Its principal defense is that Link-Belt's negligence caused the loss of the equipment and completed work billed in the invoices. We have held the evidence does not show such negligence, and it cannot be inferred except by an inference that American also was negligent, and thus the res ipsa inference is not available to American. Thus the principal defense falls.
American's second defense is that under LSA-C.C. art. 2758 "if the work be destroyed * * * previous to its being delivered to the owner, the loss shall be sustained by the undertaker, unless the proprietor be in default for not receiving it, though duly notified to do so." If American had the risk of materials under the wording of its contract, it argues, only $46,472.00 (for equipment delivered but not installed) of the $300,742.41 judgment specifically represents materials, and the judgment should at least be reduced to that amount.
LSA-C.C. art. 2758 places the entire risk on the contractor before "delivery"; see art. 2760, providing that even where the owner supplies the material the contractor gets no pay for labor on an accidentally destroyed job unless the owner-supplied materials caused the destruction.
We find no case which applies art. 2758 under circumstances completely similar to our own. In our case, although the contract called for one complete job, in fact as partial work was completed it was turned over to and accepted by and actually used by American. This is a different situation from S & W Investment Co. v. Otis W. Sharp & Son, Inc., 247 La. 158, 170 So.2d 360 (1964), where only a progress payment for a swimming pool shell had been made under a contract for a completely finished swimming pool. The court in S & W spoke of the *418 indivisibility of the contract there, which we believe does not exist here in view of the actual partial acceptances from time to time.
N. Levy & Son v. Paquette, 144 La. 244, 80 So. 269 (1918), treated a contract for piling and seawall as divisible where the piling had been formally accepted and paid for; the court held the ownership had then left the contractor. This would of course imply it was no longer the contractor's risk. We believe the same is true here as to work actually accepted, but we do not believe work not yet accepted became American's risk. Even arguing by analogy from LSA-C.C. art. 2761, relative to work composed of detached pieces, the only presumption of "delivery" is as to parts already paid for, which is not our situation.
We conclude that under general codal principles the risk of the as yet unaccepted and unpaid for work remained Link-Belt's.
However, the contract specifies that the loss or damage of materials must be insured against by American with "responsible insurance companies", once the materials left Link-Belt's or their supplier's plants, "and losses, if any, shall be payable to us [Link-Belt] as our interest may appear."
Whether American performed or breached its obligation to provide insurance on the materials we do not find in the record. If American breached this obligation, it would be liable to Link-Belt for its breach, but the amount of materials is not fully disclosed by the stipulation. If American performed this obligation, it would not be liable (but its "responsible" insurers, undesignated by the record as far as we can see, would).
On this point, the judgment against American must be reversed and the matter remanded for determination of whether American or some of its insurers should pay for the materials, and for determination of the amount of materials in addition to the $46,472 of equipment delivered but not installed.

SUBCONTRACTOR'S DAMAGE
The subrogated insurer of Link-Belt's electrical contractor obtained judgment against Link-Belt for some $6,000 of equipment destroyed in the fire, and Link-Belt appealed that judgment, although we do not find any discussion in briefs specifically directed to this item.
It appears from the record that the electrical work was all outside of the conveying system which exploded. Even interior channeling gates at conveyor junctions appear to have been pneumatically controlled, although it appears external electrical controls may have directed the air flow of the pneumatic system.
We therefore cannot declare manifestly erroneous the trial judge's obvious factual conclusion that the evidence excluded any inference of negligence on the electrical subcontractor's part, thus entitling him to the benefit of the res ipsa inference against Link-Belt. The judgment in his insurer's favor will therefore be affirmed.

DECREE
The judgments appealed from are affirmed in all respects except as follows:
(1) To the extent that reimbursement to the payer of workmen's compensation payments is provided by any judgment in respect to judgments in favor of Link-Belt's or its subcontractors' employees or their survivors against American or its insurers, that part of such judgment completely denying contribution in favor of American or its insurers is reversed and judgment is rendered granting contribution in the amount of such reimbursement (but not to exceed one half of the total award to the plaintiff), against Link-Belt; reserving to Link-Belt its right to recover this contribution from its own compensation *419 insurers or its subcontractors and their compensation insurers who receive reimbursement;
(2) To the extent that reimbursement to the payer of workmen's compensation payments is provided by any judgment in respect to judgments in favor of American's employees or their survivors against Link-Belt or its insurers, that part of such judgment completely denying contribution in favor of Link-Belt or its insurers is reversed and judgment is rendered granting contribution in the amount of such reimbursement (but not to exceed one half of the total award to the plaintiff), against American; reserving to American its right to recover this contribution from its own compensation insurers who receive reimbursement;
(3) That part of the judgment in favor of Link-Belt as plaintiff in reconvention against American in the amount of $300,742.41 for invoices for unpaid work and materials delivered is reversed, and Case No. 3239 is remanded for further proceedings on that issue not inconsistent with this opinion.
Affirmed in part; reversed and rendered in part; reversed and remanded in part.

ON APPLICATION FOR REHEARING
PER CURIAM.
One application for rehearing asserts that the stipulations and judgments for reimbursement do not specify the amount of workmen's compensation benefits recoverable under the legal subrogation of LSA-R.S. 23:1101, and the excess payments (if any) recoverable under contractual subrogation; and that accordingly our judgment for contribution in the amount of reimbursement of workmen's compensation benefits cannot be executed, unless some further determination of the amount be made.
We think it unnecessary to rehear this point and remand for determination of amounts. If resort to execution becomes necessary for this contribution, the trial court may make whatever mathematical determination is necessary to provide for execution.
All applications for rehearing are denied.